Joe Angel CORDOVA, Appellant,

v.

The STATE of Texas, Appellee.

No. 69096.

Court of Criminal Appeals of Texas, En Banc.

March 11, 1987.

Will Gray, Houston (court-appointed), for appellant.

John B. Holmes, Jr., Dist. Atty., Winston E. Cochran, Jr. and Keno Henderson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TEAGUE, Judge.

Joe Angel Cordova, hereafter referred to as appellant, appeals his conviction for capital murder, i.e., the murder of Masel Williams which was elevated to capital murder because appellant committed the offense of murder while in the course of committing and attempting to commit the offense of robbery of Williams, which was the aggravating circumstance that made the offense capital murder. Pursuant to the affirmative answers to the special issues that the jury answered, the trial court sentenced appellant to death by lethal injection. We affirm.

Appellant, through counsel, presents to us eleven reasons why this Court should set aside the trial court's judgment of conviction and sentence of death. We will overrule each of them, and affirm.

In six "points of error",[1] counsel asserts that the trial court erred in not granting his challenges for cause made as to prospective jurors Kucera, Bair, Kruse, Guest, Sullivan, and Link; in three points of error, counsel asserts that the trial court erred in sustaining the State's challenges for cause as to prospective jurors Sims, Detorre, and

---

1. Cautious appellate counsel for appellant, who was also one of appellant's attorneys at trial, has phrased his contentions as "points of error" rather than "grounds of error". This is understandable. Prior to the promulgation of the new Rules of Appellate Procedure which became effective September 1, 1986, such were labeled "grounds of error". See Tex.R.Crim.Pro. 301; Art. 40.09(9), V.A.C.C.P. Since then, they are to be referred to as "points of error". See Tex.R.App.Proc. 74(d); 210(b). Although appellant's appellate brief was filed prior to September 1, 1986, we will consider his contentions as "points of error" rather than "grounds of error."

Hampton; in one point of error, counsel asserts that the trial court's charge to the jury at the punishment stage of the trial was deficient; and in his last point of error counsel complains of the prosecuting attorneys' arguments that were made at the punishment stage of the trial.

Appellant does not challenge the sufficiency of the evidence, either as to guilt of the capital murder of Williams or as to the jury's answers to the special issues that were submitted to it at the punishment stage of the trial. Nevertheless, because of some of appellant's points of error, we will briefly highlight for the reader some of the facts of the case.

Shortly after midnight on February 27, 1982, appellant, Richard Segura, Edward Gamino, David Mendoza, and Paul Guillory, appellant's fifteen-year-old nephew, left a lounge located in Houston, after apparently ingesting some of the spirits that the lounge owner sold, and thereafter, in Segura's automobile, drove around in the northeast part of Houston. While doing this, they all apparently, either expressly or implicitly, singularly or collectively, agreed to commit a robbery in a convenience store. Appellant, who was then armed with a shotgun, was described as being "crazy drunk". After the group located what they considered "a good place to rob," appellant, armed with the shotgun, and Guillory went inside the store but because they saw a patrolling police car they decided not to commit the robbery and left the store only to find that Segura, who had remained inside of the automobile which he had driven to the store, and who could have also seen the patrolling police car, had driven off in the car leaving the rest of the group stranded on the outside of the store. The group, sans Segura, with appellant still armed with the shotgun, then commenced walking down Little York Road where they encountered a person later identified as Williams, the deceased, who was then in a telephone booth using a telephone.

Williams' wife, Seina, testified that Williams left their residence in their black Cadillac automobile around 9:00 p.m. on the night in question to go and shoot pool. Rather than go and shoot pool, however, Williams went to June Evans', his girlfriend's residence. Williams soon left Evans' residence to visit his mother. For reasons not clearly reflected in the record, Williams left Evans' residence in her 1979 Buick automobile, which had personalized license plates, "J Evans". At approximately 2:30 a.m. in the morning in question, Williams telephoned Evans from a telephone booth informing her that he had locked the car keys to her car inside of the car and needed Evans to bring him another set of keys. We are not apprised how Williams arrived at that location or how he managed to lock the car keys inside of Evans' car. When Evans inquired where he might be, Williams told her he did not know. Evans testified that she then heard noises in the background and also heard Williams state, "Man, where am I?" Williams then said to Evans: "Hardy and Little York." Evans then put Williams on hold so that she could go and see if she could find someone to take her to Williams' location. After successfully finding someone, Evans returned to the telephone, picked it up, but after putting the receiver to her ear she heard nothing since the line was then dead. Evans and a neighbor soon thereafter went to the intersection of Hardy and Little York but they saw neither Williams nor her vehicle. Evans later recovered her automobile in Laredo, sans a back window, which had been broken out since she had last seen her vehicle.

We now return to the location where Williams was last heard from.

While in the telephone booth, and using the telephone, presumably speaking to Evans, Williams, while holding the telephone, saw appellant's group, apparently walking near where he was situated. He did not know any of the group. He called them over to the telephone booth where he was and asked them if they "knew where [he] was," but someone in the group told him he did not know the name of the street on which they were then standing. Someone in the group then asked Williams if he would give them a ride. Williams told that

person that he could not do so because he had locked the car keys inside of the car. At this time, appellant "threw down" on Williams with his shotgun, after which Williams hung up the telephone. Soon thereafter, Mendoza, using the shotgun, broke out one of the back windows to Evans' automobile, thus enabling the group to get inside of Evans's vehicle, after which they stole the vehicle. Thereafter, the group, with Williams, then left that location. When appellant pointed the shotgun at Williams, Williams realized that his life might be in danger. Williams began pleading, "Please don't kill me." When appellant demanded that Williams turn over to him what money he had, Williams responded: "I ain't got no money, I just like you are, I need a job too." Thereafter, the group, with their kidnapped victim Williams, with appellant driving, went to a location on Mohawk Street, where a short distance from the street, but in a very wooded area, Williams soon met his death. Williams, who was then alone with appellant, was shot at close range with the shotgun by appellant, which caused Williams' death.

The group then left that location, and Williams' almost nude body, and went to the residence of one Ramos where appellant sold the shotgun to Ramos for $100.

After selling the shotgun to Ramos for $100, the group, now consisting of appellant, Guillory, and Mendoza, soon thereafter drove into Mexico in Evans' automobile. The record reflects that after the group left Ramos' house, appellant, who was then driving Evans' car, let Gamino out near the residence of a person who was Gamino's friend. After the group returned to a Texas border crossing location, due to the border guards becoming suspicious of them, appellant fled but was subsequently arrested in Houston. Apparently, Guillory and Mendoza were arrested by border patrol agents and later returned to Houston.

Williams' almost nude body was found the next morning by, strange as fate might have it, Guillory's brother. The police were notified.

Careful police investigation, with assistance from Guillory, Mendoza, and Gamino, together with oral incriminating admissions by appellant, caused the police to reconstruct what had happened to Williams on the night and morning in question, which we have above highlighted.

Appellant did not testify and presented no evidence at either the guilt or punishment stages of the trial.

The State established at the punishment stage of the trial that the then almost thirty-one-year-old appellant previously had been convicted of the felony offenses of robbery by assault and burglary of a building, for which he served time in the Department of Corrections.

In points of error numbered one through six inclusive, appellant's counsel asserts that the trial court erred in not sustaining his challenges for cause as to prospective jurors Kucera, Bair, Kruse, Guest, Woods, and Link. We disagree.

Appellant claims that his challenge for cause as to prospective juror Kucera should have been sustained because Kucera's "personal experiences would have affected both his consideration of the evidence and his deliberations." We disagree.

In *Barrow v. State*, 688 S.W.2d 860, fn. 1 (Tex.Cr.App.1985), this Court recently reaffirmed the proposition that "The key to the analysis of the propriety of all rulings upon challenges for cause is not the use or lack of use of a single word but the import of the voir dire of the veniremen *taken as a whole*." Also see *Jernigan v. State*, 661 S.W.2d 936, 942, fn. 8 (Tex.Cr.App.1983).

Kucera's voir dire taken as a whole reflects that Kucera, who had previously served as a juror in a murder case and in another criminal case in which the only defensive issue was apparently the defendant's insanity, almost immediately told the trial judge that he did not know of any reason why he could not be a fair and impartial juror if selected as a juror to hear this case and also, again almost immediately, told a prosecuting attorney that he could follow the statutory scheme in answering the special issues if he found appellant guilty of capital murder, and would

answer the special issues either in the affirmative or negative depending on the evidence that had been presented. When asked by the prosecuting attorney, "Anything that you can think of that might cause you not to be a fair and impartial juror in this case?", Kucera responded: "I don't know. There's only one thing. I am in a neighborhood where we have had a rash of burglaries in the last two or three years and got so bad that we couldn't depend on the city police over there. We have had to get the constable over there and we're paying extra money over there to get that in there and the burglaries have stopped." Kucera also testified that he could set aside his feelings that resulted from what he had vicariously experienced, "I imagine so." When examined by defense counsel, Kucera, who stated that his residence had not been one of those in his neighborhood burglarized, and who never stated that he personally had been the victim of a criminal act, detailed the criminal break-ins and robberies that some of his neighbors had sustained. Kucera admitted that the above "might influence [him] ... in considering the evidence in this case since it involves an allegation of robbery." When counsel for appellant succeeded in getting Kucera to admit that he could not be a fair and impartial juror because of the above, counsel then challenged Kucera for cause. The prosecuting attorney then re-examined Kucera. Kucera testified that "I would say our neighborhood problems are not as paramount as they were because we do have the protection over there. I would say the evidence would be what I would have to stand on there." Kucera then testified that he "believed" that he could be a fair and impartial juror. The trial judge then denied the challenge. Defense counsel then continued to examine Kucera, after which Kucera testified that "Each case would be [judged] on its own merits, just as in our neighborhood over there, that each case was a little different deal there ... I would listen to the law on that and be governed by the law on the case ... [Before answering questions], I would go back to the evidence that was submitted on that." Kucera again stated that even

though what had happened in his neighborhood would still be in his mind, he believed that he "probably could be" a fair and impartial juror, and that in any event he would judge the case "on the merits of the case." Defense counsel thereafter used one of his peremptory strikes on Kucera.

■ We agree with the State that we must first decide whether Kucera "demonstrated either a bias against the appellant as a person or a bias against some phase of the law upon which the appellant is entitled to rely," (page 2 of State's brief), because a juror is subject to challenge for cause by the defendant if he has a bias or prejudice against the defendant or if he has a bias or prejudice against any phase of the law upon which the defendant is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefor. See Art. 35.-16(a)(9), supra, and 35.16(c)(2), supra. We answer the questions in the negative.

■ We find that the voir dire examination of Kucera taken as a whole does not reflect or indicate that Kucera had any personal feelings against appellant, who he testified he did not know. He never stated that he would hold appellant responsible, either directly or indirectly, for what had occurred in his neighborhood, or that he would consider what had occurred in his neighborhood in deciding appellant's guilt or the answers to the special issues, or that he would not follow the law as given by the trial judge in deciding guilt or the special issues on punishment. Furthermore, at no time did Kucera state that his vicarious experience would prevent him from giving appellant the presumption of innocence, or that such would cause him to lessen the State's burden of proof on guilt or on the special issues, nor did he ever express the belief that his vicarious experience caused him to form the opinion that appellant was then guilty or that if he voted to find appellant guilty that his vicarious experience would cause him to automatically answer the special issues in the affirmative, resulting in the trial court assessing the sentence of death. In sum, at no time did

Kucera expressly state that his vicarious experience would influence or affect him in deciding appellant's guilt, or in answering the special issues in the event there was a finding that appellant was guilty of capital murder, or in following the trial court's instructions to the jury on the law of the case. In short, a careful reading of the voir dire examination of Kucera does not reflect or indicate that his vicarious experience "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Whatever "effect" the vicarious experience might have had on Kucera, he never testified that such would cause him to be unwilling or unable to obey the law or follow the oath of a juror. The testimony of Kucera, when taken as a whole, does not reflect or indicate that he was disqualified, as a matter of law, from serving as a juror in this case. E.g., *Ex parte Russell*, 720 S.W.2d 477 (Tex.Cr.App.1986); *Mann v. State*, 718 S.W.2d 741 (Tex.Cr.App.1986); *Peters v. State*, 575 S.W.2d 560 (Tex.Cr. App.1979); *Anderson v. State*, 633 S.W.2d 851 (Tex.Cr.App.1982); *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr.App.1980). Although not cited in either the State's or appellant's brief, we find that this Court's recent decision of *Holloway v. State*, 666 S.W.2d 104 (Tex.Cr.App.1984), in which this Court reversed the trial judge's judgment and sentence in a non-capital felony case because the trial judge erroneously failed to sustain the defendant's challenge for cause to a prospective juror, though similar factually to Kucera's voir dire examination, is easily distinguishable.

There, the prospective juror stated that her residence had recently been burglarized by an unknown burglar or burglars. She stated that she was not sure how that personal experience would affect her if she were selected as a juror. She also testified that she did not know, because of her experience, whether she could presume the defendant innocent. She further testified that she might find the defendant guilty because of her experience, "I hope I wouldn't, but I don't know"; "I don't know

whether I would or not." She lastly testified that because of what had happened to her she might lessen the State's burden of proof. Given what we have set out, the challenger in that cause, who had the burden of proof, clearly demonstrated for the record through the juror's answers that she could not be a fair and impartial juror, or that her personal experience was such that it would have prevented or substantially impaired the performance of her duties as a juror in accordance with the trial court's instructions on the law and her oath as a juror. As easily seen, what occurred in *Holloway*, supra, and what occurred here makes the two cases easily distinguishable. Appellant's first point of error is overruled.

We next address appellant's counsel's complaint that his challenge for cause as to prospective juror Bair should have been sustained because Bair "showed his bias in favor of the death penalty which would have affected both his consideration of the evidence and his deliberations." We must again disagree with appellant's counsel.

The voir dire examination of Bair reflects that Bair first told the trial judge that he "strongly advocated the death penalty," and based on conversations that he had had with persons who had served time in the penitentiary he had concluded that all "three to five time losers" rightfully deserve to receive the death penalty. Bair, however, also told the trial judge that because he might find someone guilty of capital murder did not mean that he would automatically answer the special issues in the affirmative. Bair further told the trial judge that if the State failed to prove the appellant's guilt beyond a reasonable doubt he would vote to find the appellant not guilty. During one of the prosecuting attorneys voir dire examination, Bair told the prosecuting attorney, inter alia, what he had told the trial judge. When examined by one of appellant's attorneys, Bair told counsel that "If the man is guilty, walked in [to court?] and said, 'To hell with it,' then yes, I do [believe that person should be sentenced to death]," thus demonstrating that he wanted such a defendant not to

come before him and display an air of arrogance or lack of remorse. However, Bair never stated that he would require appellant or anyone else to testify and demonstrate the fact that he was repentant or remorseful over what he had done. Bair also told defense counsel that he had some strong views regarding why he thought our parole system and the criminal justice system in general were fouled up. Bair further made it known to counsel he was concerned about persons who had been victims of criminal acts, which is understandable. Notwithstanding his strong, and probably erroneous legal views, Bair also testified that he could set aside his strong feelings and possibly erroneous legal views if selected as a juror in appellant's case. He testified that he would have no problem "segregating" his strong feelings and beliefs in deciding the appellant's guilt or answering the special issues on punishment in the event appellant was found guilty. Bair also testified that his beliefs would not cause him to lessen the State's burden of proof, "They have still got to jack up, stand up and say we know, we have, we show-they have to." Appellant's challenge for cause was overruled by the trial judge, after which his counsel used a peremptory strike on Bair.

We also observe, although the record is not as clear as it could have been, that after Bair was excused, and after he left the courtroom, he exclaimed to four other prospective jurors who were seated outside the courtroom that "he really wanted to fry the guy"; that "the defendant was so scared that he couldn't even swallow"; that he thought "that the defense lawyer was a real slick lawyer." By agreement, the four prospective jurors who heard what Bair had stated to them were excused by the cautious trial judge.

■ Much of what we have stated regarding appellant's first point of error is applicable here. We agree with the State that "Bair, like Kucera, was the kind of venireman for whom peremptory strikes were designed." We are unable to state, as a matter of law, that Bair's views, as stated *on* the record, are such to allow us

to conclude that they would have prevented him from performing his duties as a juror in accordance with the law and his oath as a juror, had he been selected as a juror.

Was Bair shown to be biased against the law, *as a matter of law?* Recently, in *Clark v. State*, 717 S.W.2d 910, 917 (Tex. Cr.App.1986), this Court reaffirmed the following principles of law: "When a prospective juror is shown to be biased against the law, *as a matter of law*, he *must* be excused when challenged for cause, even if he states that he can set his bias aside and be a fair and impartial juror. *Anderson v. State*, supra. If the juror states that he believes that he can set aside any biases he may have, and the trial court overrules a challenge for cause, its decision will be reviewed in light of all of the answers the prospective juror gives. *Anderson v. State*, supra." In *Clark*, supra, this Court, quoting from *Pierson v. State*, 614 S.W.2d 102 (Tex.Cr.App.1981) (On original submission), held that "Under *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), prospective jurors who have serious attitudes, but who nonetheless state that they can honestly determine the facts and abide by the law, may not be excluded from jury service" under the principle of law stated in *Witherspoon v. Illinois*, supra. Also see *Mays v. State*, 726 S.W.2d 937 (Tex.Cr.App.1986).

After having reviewed Bair's *in court* voir dire examination in its entirety, we are unable to conclude that counsel for appellant established as a matter of law that Bair was subject to a challenge for cause.

■ What effect, however, do the statements that Bair made *outside of the courtroom*, that were introduced into evidence through unobjected to hearsay testimony of a witness, have on the above? Unobjected to hearsay has now been held by a majority of this Court to have probative value. See *Chambers v. State*, 711 S.W.2d 240 (Tex.Cr.App.1986). Thus, in light of *Chambers*, supra, we cannot ignore the out-of-court statements that Bair made, notwithstanding the fact that they came into evidence through hearsay testimony. We must thus decide whether as a matter

of law Bair's in-court testimony combined with his out-of-court statements caused him to be subject to a challenge for cause by appellant. We answer the question in the negative. The trial judge, who heard and witnessed Bair's in-courtroom voir dire examination, is the same person who was made aware of Bair's out-of-court statements. By again denying appellant's challenge for cause he undoubtedly concluded that Bair was not subject to a challenge for cause because he had a bias or prejudice against appellant. We find Bair's statement "he wanted to fry the guy" could be interpreted not to mean that he had prejudged appellant's guilt or in the event that appellant was found guilty of capital murder that he had not already decided that the answers to the special issues should be answered in the affirmative. Given the ambiguity of what Bair's out of court statement, that "he wanted to fry the guy," might mean, we believe that this is a situation where we must defer to the trial judge. E.g. *Wainwright v. Witt*, supra. Given the fact that the trial judge saw and heard Bair in the courtroom, and later heard what Bair had stated outside the courtroom, and denied the reurged challenge for cause, we are unable to conclude that Bair left the trial judge with the definite impression that he would not be able to faithfully and impartially follow the trial court's instructions on the law and his oath as a juror if he had been selected as a juror. Bair was not as a matter of law subject to a challenge for cause. The trial judge did not err in not granting appellant's challenge for cause. Appellant's second point of error is overruled.

In his third point of error, counsel for appellant asserts that prospective juror Kruse was subject to a challenge for cause because Kruse demonstrated during his voir dire examination "his bias in favor of the death penalty which would have affected both his consideration of the evidence and his deliberations." Again, we must disagree with counsel.

Kruse, who apparently previously served as the jury foreman in a criminal case, first told the trial judge that he did not know of any reason why he could not be a fair and impartial juror. Kruse next told one of the prosecuting attorneys, among other things, that he would assess the death penalty if it were established that the crime committed was shown "to be very violent or possibly mass [murder]." Kruse told one of appellant's attorneys that in the event that he found a defendant guilty of capital murder he would "possibly" assess the death penalty; that he would "not necessarily" assess the death penalty if he found a person guilty of capital murder; "I don't have anything against voting for capital punishment, but I [also] don't have anything against voting for life imprisonment, depending on the violence of the crime"; "To me there are different violences involved in a crime." Kruse then gave counsel examples of how he viewed violent crimes differently even though each example he gave was committed in a violent manner. Thus, Kruse made it clear that he would not place all crimes committed in a violent manner in the same category.

■ Given the totality of the voir dire examination of Kruse, we are unable to hold as a matter of law that the trial judge erred in not sustaining counsel's challenge for cause. Although Kruse testified in a general way that his views for the death penalty "would influence his considerations of the evidence in any murder case," a careful reading of the entire, and remaining, voir dire examination of Kruse leads us to the inescapable conclusion that Kruse was not prohibited, as a matter of law, from serving as a juror in this cause. Kruse was not subject to a challenge for cause. Appellant's third point of error is overruled.

Appellant's counsel asserts in his fourth point of error that prospective juror Guest was subject to his challenge for cause because "his bias in favor of the death penalty would have affected both his consideration of the evidence and his deliberations." Again, we must disagree with counsel.

Guest was shown to be the type of prospective juror who basically believes that if a defendant were found guilty of a crime he should be punished in accordance with

the Biblical admonition, "an eye for an eye and a tooth for a tooth". In that regard, Guest basically believed that if one person murdered another person, then that person forfeited his life by his act of murder. Guest also testified that "if [a person] is found guilty, punishment should be given [and,] [i]f it called for death, yes, sir, I feel like, you know, punishment should be given if it called for death." Guest further stated that he would not automatically vote to impose the sentence of death in every capital murder case: "I feel like there are exceptions to everything"; "I feel like that he can be put out of society without being killed but in most cases, yes, I feel like that he should be put to death but there are exceptions." Guest also stated that he could put his strong feelings aside if selected as a juror: "Just because I say an eye for an eye, a tooth for a tooth doesn't mean that I cannot be fair ... to my fellow man"; I feel like that I can be fair in my judgment whether he was either guilty or not ..."; "He's innocent—in my books he's innocent until it's proven without a reasonable doubt that he is guilty ... And if he is found guilty, I feel like that, you know, he should be put to death ..." Guest later clarified his last statement when he stated that he would not automatically vote to assess the death penalty if he found someone guilty of capital murder but would make that decision based upon "the evidence given to [him]."

Nevertheless, Guest responded to the following question by appellant's attorney, "But if he's convicted of the offense of capital murder, you would vote for the death penalty?," as follows: "Yes, sir, I would say so, yes, sir." Thus, without more, Guest was probably then subject to a defense challenge for cause.

However, but thereafter, Guest told one of the prosecuting attorneys several times that "If the court instructed him to set [his] feelings aside and base [his] decision to these questions based solely on the evidence," he was capable of doing that, and that he would answer the special issues "solely on the evidence and nothing else." "Question by prosecuting attorney: So if the State did not bring you sufficient evidence that proved that the answers to these questions should be yes, you could say no, is that fair? A: Yes, sir. Q: Even though you knew the defendant was going to get life? A: Yes, sir."

The record reflects that appellant's counsel did not seek to further question Guest. The trial judge overruled his challenge for cause after the above questions were asked and answered.

■ Viewing the entire voir dire examination of Guest, we conclude that he was not disqualified, as a matter of law, from serving as a juror.

■ Although a juror might express strong feelings for imposing the sentence of death, if he also unequivocally states that he could set aside those feelings and follow the trial court's instructions on the law and would base his verdict or his answers to the special issues on the evidence adduced, such person is not disqualified *as a matter of law* from serving as a juror in a capital murder case in this State. See *Anderson*, supra. Where the prospective juror states that he believes that he can set aside any influences he may have, and the trial court overrules the defendant's challenge for cause, the trial court's decision will be reviewed in light of all the answers the prospective juror gives. *Anderson v. State*, supra. After having carefully reviewed the voir dire examination of Guest, we conclude that the trial court did not err in overruling appellant's challenge for cause. Appellant's fourth point of error is overruled.

Appellant's counsel asserts in his fifth point of error that the trial court erred in not sustaining his challenge for cause as to prospective juror Sullivan. He asserts that Sullivan could not consider the minimum punishment of five years' imprisonment if the jury found the appellant guilty of the lesser included offense of murder. Once again, we must disagree with appellant's counsel.

Sullivan, who had previously served as a juror in a criminal case, almost immediately told the trial judge that she did not know of anything that would cause her to be other

than a fair and impartial juror if selected as a juror in this cause, and would decide both the appellant's guilt and, if she found appellant guilty, the answers to the special issues solely upon the evidence adduced. In fact, Sullivan's responses to the trial judge reflect that her decisions in resolving any disputed facts or issues would be strongly affected by the evidence that was presented to her.

 In response to one of the prosecuting attorney's questions, Sullivan made it clear that she was very much in favor of the death penalty, but she also made it clear, at least implicitly, that she would not automatically vote to impose the death penalty merely because she had voted to find someone guilty of capital murder. Sullivan also made it clear that she was very much in favor of the presumption of innocence and believed that the State had the burden to prove its case beyond a reasonable doubt. It is obvious to us from her answers that when one of counsel for appellant questioned Sullivan regarding the possibility of finding the appellant guilty of the lesser included offense of murder and assessing the minimum punishment for that offense, counsel's questions were not as clear as they should have been. Reading the questions from a cold record, we find that they are not very well articulated. However, when one of the prosecuting attorneys again questioned Sullivan on this subject, Sullivan made it clear for the record that she would be able to consider imposing the minimum punishment for the offense of murder if she found a defendant guilty of that offense. Neither of appellant's attorneys sought to further question Sullivan after she gave her last expression on the subject.

A prospective juror who demonstrates a bias against a phase of the law upon which the defendant is entitled to rely is subject, as a matter of law, to a challenge for cause under Article 35.16(c)(2), V.A.C.C.P. E.g., *Jordan v. State*, 635 S.W.2d 522 (Tex.Cr. App.1982), and *Barrow v. State*, supra, in which this Court reversed where it was established as a matter of law that the prospective jurors could not consider the minimum punishment for the hypothetical lesser included offense of murder that they were given. Here, however, Sullivan's final response clearly demonstrates that she could consider the minimum punishment for the lesser included offense of murder. Viewing her voir dire in its entirety, we find that Sullivan did not demonstrate an inability to consider the full range of punishment, including the minimum punishment, for the lesser included offense of murder. Also see *Williams v. State*, 622 S.W.2d 116, 121 (Tex.Cr.App.1981) (Teague, J., dissenting opinion). The trial court did not err in denying appellant's challenge for cause. His fifth point of error is overruled.

In his sixth point of error, appellant's counsel asserts that the trial judge erred in sustaining the State's challenge for cause as to prospective juror Sims. We again must disagree with counsel.

Almost immediately, Sims made it known to all that because of her religious beliefs she was strongly against the death penalty: "I don't think I could give the death penalty to anyone ... I just don't believe in it ... I don't believe in the death penalty." She also stated that she could not participate in a proceeding where the death penalty might result; that she could not find someone guilty of capital murder if a possible punishment was death; that she would vote "no" to one of the special issues regardless of the evidence so that the death penalty could not be assessed. When examined by one of appellant's attorneys, Sims again made her views known: "I just said I don't think I could sentence anybody to death. That's what I am saying." Sims, however, did state that if selected as a juror she would try to fairly and impartially decide appellant's guilt, "I can find [him] guilty." However, when it came to answering the special issues, Sims again stated, "I just wouldn't be able to, you know, to say that [he] was to die, that is what I was talking about," thus making it clear for the record that her religious views would cause her to answer at least one of the special issues in the negative to prevent the death penalty from being assessed, "I couldn't answer [the special issues] fair, I don't think."

We find and hold that Sims' views on the death penalty were such that they would have prevented or substantially impaired the performance of her duties as a juror if she had been selected as a juror in this cause. See *Clark v. State*, supra.

Before a prospective juror is qualified to sit as a juror, that person must unequivocally demonstrate for the record that he or she would not disregard his oath or the trial court's instructions on the law in deciding both guilt and punishment. Thus, a prospective juror who unequivocally demonstrates for the record that he could fairly decide the issue of guilt, but would not be able to decide the issue of punishment or answer special issues fairly and impartially based upon the evidence, is a disqualified, as a matter of law, prospective juror. Thus, the prospective juror must be able to fairly and impartially judge and decide not just one issue; he or she must be able to fairly and impartially judge and decide both the defendant's guilt as well as the punishment to be assessed, or, in capital murder cases, the answers to the special issues. In this instance, even if we assume that Sims could have been a fair and impartial juror in deciding appellant's guilt, we are still confronted with the fact that she stated that her religious views regarding the death penalty would have prevented her from serving as a fair and impartial juror in answering the special issues. Sims was thus subject to the State's challenge for cause and the trial judge did not err in sustaining the State's challenge for cause. Appellant's sixth point of error is overruled.

Appellant's counsel asserts in his seventh point of error that the trial court erred in sustaining the State's challenge for cause as to prospective juror Detorre, in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). He also asserts in his eighth point of error that the trial judge erred in sustaining the State's challenge for cause as to prospective juror Hampton, also in violation of *Witherspoon v. Illinois*, supra. We again must disagree with appellant's counsel.

Because the two points of error are virtually identical, we will consolidate them for review purposes.

Much of what we have previously stated regarding appellant's sixth point of error, regarding prospective juror Sims, is applicable to our following disposition of appellant's seventh and eighth points of error, which we will overrule.

In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court modified its opinion of *Witherspoon v. Illinois*, supra, upon which appellant's counsel relies, which had held that potential jurors may be excused for cause only when their opposition to the death penalty is such that they would automatically vote against a sentence of death *or* would be impaired in the task of determining the defendant's guilt. *Witt*, supra, however, held that the proper test is not whether the record shows with unmistakably clarity that that person would automatically vote against the death penalty, but is instead whether the juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 469 U.S. at 424, 105 S.Ct. at 852. *Witt*, supra, also made it clear that the trial judge's determination that a potential juror is impermissibly biased is a factual finding. Also see *Darden v. Wainwright*, 477 U.S. 187, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). However, as we pointed out in *Clark v. State*, supra, at 915, this does not mean that the trial judge's decision is either not reviewable or is entitled to a presumption of correctness by an appellate court. Instead, "We review such decision with our eyes focused upon the entire written transcription of the voir dire interrogation of the challenged prospective juror who is held by the trial judge subject to or not subject to a challenge for cause by one of the parties."

Detorre first told the trial judge that even if she were convinced that the answers to the special issues had been established beyond a reasonable doubt she would not answer them in the affirmative because of her beliefs regarding the death penalty.

She also told the trial judge that she could not set her beliefs aside and base her answers solely on the evidence. She told one of the prosecuting attorneys that because of her beliefs, if selected as a juror in this cause, she did not think she would be a fair and impartial juror because her beliefs regarding the death penalty would influence her verdict. Detorre did state, however, that she "might go with capital concerning a [defendant who killed] a young child." However, when examined by one of appellant's attorneys, Detorre affirmatively stated for the record that her beliefs against the death penalty would prevent her from judging the appellant's guilt, but that she would "try" to not let those beliefs interfere with her decision. She then stated unequivocally and rather plainly that she simply could not participate in the decision making process of the punishment stage of a capital murder case knowing that the death penalty might result if she answered the special issues in the affirmative. Nevertheless, she stated that she would "try" to answer the issues correctly. However, when asked the following, "Do you think that you would let your feelings affect your deciding a fact, whether or not something occurred? You could disbelieve something simply because of your feelings, or you would follow the law and if something was believable as far as the first part of the case, you would return a true verdict that reflected the truth. Can you do that?", Detorre responded: "I think what it boils down to, probably not." Soon thereafter, the trial judge sustained the State's challenge for cause.

Hampton, who was only questioned without objection by the trial judge, initially told the trial judge that because of her feelings about the death penalty she thought that it might be impossible for her to answer the special issues in the affirmative, even if the State proved to her satisfaction beyond a reasonable doubt that the questions should be answered in the affirmative: "I can't say yes. I would have to say no." She also stated that the State could never present sufficient evidence that might cause her to answer the special issues in the affirmative. She told the trial judge that because of her beliefs she could not take the juror's oath if selected. She further stated to the trial judge that she could not envision a case where she could answer the special issues in the affirmative.

We find that both Detorre and Hampton were not only excludable under the more stringent disqualification test set out in *Wainwright v. Witt*, supra, but were also excludable under the more liberal disqualification standard set out in *Witherspoon v. Illinois*, supra.

In *Witherspoon*, supra, the Supreme Court held that a juror was subject to being challenged for cause only if he made it unmistakably clear that he would automatically vote against the imposition of the death sentence without regard to any evidence that might be developed at the trial, or that his attitude toward the death penalty was unmistakably clear that such would prevent him from making an impartial decision as to the defendant's guilt or his punishment or in answering the special issues.

In *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court also stated that a prospective juror may be challenged for cause only if his views on the death penalty were unmistakably clear that such would prevent or substantially impair the performance of his duties as a juror in accordance with the trial court's instructions and his oath as a juror. It also held, however, that the State may insist that prospective jurors will consider and decide the facts impartially and would conscientiously apply the law as charged by the court.

In *Wainwright v. Witt*, supra, the Supreme Court lessened the standard for disqualification that it had framed in *Witherspoon v. Illinois*, supra, and promulgated the standard that it is only when the juror's views are such that they would prevent or substantially impair the performance of his duties as a juror in accordance with his oath and the trial court's instructions that the juror is subject to being challenged for cause.

Either expressly or implicitly, the record reflects or indicates that both Detorre and Hampton's beliefs regarding the death penalty make it unmistakably clear that such would prevent or substantially impair the performance of their duties if they had been selected as jurors. Contrary to counsel for the appellant, we find that both Detorre and Hampton unequivocally demonstrated on the record that they would automatically vote against the imposition of the death penalty without regard to any evidence that might have been developed at appellant's trial, either on the issue of guilt or on the special issues. There is no ambiguity in what both Detorre and Hampton stated. There is also no ambiguity in our holding that appellant's points of error are overruled.

Appellant's counsel asserts in his ninth point of error that the trial court erred in denying his challenge for cause as to prospective juror Link. Once again we must disagree with appellant's counsel.

Link, whose residence had been twice burglarized, first told the trial judge that he had no objections to the death penalty being assessed one convicted of capital murder. Our reading of Link's entire voir dire examination leads us to the conclusion that Link would have been a more than acceptable juror for the prosecution. When questioned by one of appellant's attorneys, Link also stated that he believed that the death penalty was an appropriate punishment, "[I]n some cases ... I feel that it is probably applicable in many, but not all, and particularly violent crimes against a person, maybe not necessarily resulting in the death of that person may be appropriate." Link expressed dissatisfaction with the fact that even though he was aware as a citizen that some defendants who had been convicted of capital murder, who he believed had had fair trials

and their convictions had been affirmed, which conclusion apparently came from what he had read and heard, none had not been executed by the authorities.[2]

Link, however, also stated that before he would vote to impose the death penalty it would be necessary for the State to present him with "a sufficiently good case." He also stated that appellant could rest assured that "he would receive a fair hearing on punishment from me." We believe that the following answer that Link gave might best summarize what he was trying to tell counsel for appellant: "I have no particular qualms about applying the death penalty [or imposing a life sentence], but I also do not feel that [either] has to be applied." Link also stated that if appellant were found guilty of capital murder, it was his "personal opinion that [he, Link,] could answer both of the questions independent of that guilty assessment." When Link was questioned regarding his view that he would not give much, if any, weight to intoxication or age as mitigating circumstances, he stated that he did not "necessarily find youth to be an excuse or a mitigating circumstance for the perpetration of a violent crime." Link also expressed the view that he did not consider intoxication to be an adequate excuse for committing the offense of capital murder. However, Link also testified that he would not rule out a defendant's youthfulness or his intoxication at the time of the commission of the offense as mitigating factors or circumstances; he simply would not give them "much weight". As previously pointed out, appellant was thirty years of age when he committed the murder of Williams and had twice been sent to the penitentiary for at least two felony offenses. Given appellant's age, we are at a loss to understand how his chronological age, standing

2. We pause to point out that shortly after Link became a juror in this cause, and during appellant's trial, Texas ended its 18 year moratorium on executions, when on December 7, 1982, it executed Charlie Brooks, Jr., see *Brooks v. State*, 599 S.W.2d 312 (Tex.Cr.App.1979). We cannot, of course, state that had Link known what was soon to take place, when he was questioned on voir dire, that this would have affected any of

the answers he gave. However, given the fact that Brooks' execution received an enormous amount of publicity, it would have been virtually impossible for Link not to have been aware of same, and the fact that Link did serve as a juror in this cause, and voted in such a manner as to cause the death penalty to be assessed, we doubt that it would have had any effect on him.

alone, might have been a migitating factor or circumstance in how the jury might have decided the answers to the special issues.

In Texas, voluntary intoxication is no defense to the commission of a criminal wrong. See V.T.C.A., Penal Code, Section 8.04(a). However, such may become mitigating evidence to the penalty attached to the offense for which the defendant is being tried if the intoxication caused temporary insanity. See Section 8.04, supra.

Appellant's challenge for cause was denied, and, because appellant had exhausted his peremptory strikes, Link became the twelfth juror. A request by one of appellant's attorneys for additional peremptory strikes was denied by the trial court.

Based upon the above views that Link had, regarding youth and intoxication as mitigating factors, appellant's counsel asserts that in light of *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), Link was incapable of following the law and his challenge for cause should have been sustained. We once again must disagree with appellant's counsel.

Our understanding of both *Eddings,* supra, and *Lockett,* supra, is that the Supreme Court did *not* mandate that a prospective juror must give any amount of weight to any particular fact that might be offered in mitigation of punishment, nor has our research to date revealed where this Court has ever laid down such a requirement. We believe that when properly read, *Eddings,* supra, and *Lockett,* supra, merely held that the fact-finder must not be precluded or prohibited from considering any relevant evidence offered in mitigation of the punishment to be assessed, or in answering the special issues. The decisions of the Supreme Court, and of this Court, do not, however, require an affirmative instruction that the fact-finder *must* give any specified weight to a particular piece of evidence, as appellant's counsel appears to contend. The amount of weight that the fact-finder might give any particular piece of mitigating evidence is left to "the range of judgment and discretion"

exercised by each juror. See *Adams v. Texas,* supra, 448 U.S. at 46, 100 S.Ct. at 2526. Under our capital punishment scheme and procedures, mitigation is given effect by whatever influence it might have on a juror in his deciding the answers to the special issues. Also see *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

Here, Link explicitly stated that he would consider evidence of intoxication and the appellant's age as mitigating circumstances, but he did not personally believe or think they were entitled to much, if any, weight. Thus, Link effectively agreed to follow the law. He never testified that he would not consider intoxication and age as mitigating evidence or circumstances, nor did he state that he would not consider such in deciding the special issues. The trial court's denial of appellant's challenge for cause did not constitute error. Appellant's point of error is overruled. Also see our discussion *post* regarding appellant's tenth point of error, which asserts that the trial judge was obligated to give the jury an affirmative instruction on intoxication as a mitigating circumstance.

Appellant's counsel asserts in his tenth point of error that "The trial court committed reversible error in refusing to charge the jury that intoxication could be considered by it in mitigation of punishment." Once again, we must disagree with counsel.

At trial, counsel objected to the charge on punishment, "because it fails to instruct the jury to affirmatively consider intoxication and any other mitigating factors raised by the evidence at either stage of the trial in answering the special punishment issues." His objections were overruled.

Much of what we have previously stated under our discussion involving prospective juror Link is applicable here.

Although the issue has been presented in many different forms, this Court has consistently rejected the contention that the Texas statutory capital murder scheme and the Fifth, Eighth, and Fourteenth Amendments to the Federal

Constitution require that the trial court give an affirmative instruction that the jury must consider or apply mitigating evidence in their deliberations. As previously pointed out, we find nothing in either *Eddings*, supra, or *Lockett*, supra, that would mandate the giving of a general or special instruction on mitigating evidence. E.g., *Demouchette v. State*, 731 S.W.2d 75 (Tex. Cr.App.1986). Also see *Quinones v. State*, 592 S.W.2d 933, 947 (Tex.Cr.App.1980), in which this Court held that no such affirmative instruction was necessary because "The jury can readily grasp the logical relevance of mitigating evidence to the issue of whether there is a probability of future criminal acts of violence. No additional charge is required." [3]

In reference to appellant's counsel's contention in his tenth point of error, that the jury should have been affirmatively instructed on voluntary intoxication as a mitigating factor on punishment, counsel does not point out where in the record appellant presented sufficient or any evidence that might have raised the issue of temporary insanity caused by intoxication, and our reading of the record has yet to reveal where the issue of temporary insanity by reason of voluntary intoxication was raised by the evidence. We assume that counsel is referring to the testimony that depicted appellant as being "crazy drunk" during the morning when he murdered Williams.

Section 8.04(b) of the Penal Code, however, only provides as follows: "Evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried." Neither the statute nor our case law construing the statute permits the inference that merely where one presents evidence that

he was intoxicated or "crazy drunk" when he committed the crime that this automatically means that when the individual committed the crime he was then temporarily insane by reason of voluntarily ingesting a known or unknown quantity of a liquid or solid intoxicating substance into his body, and our research has yet to reveal any legal or scientific authority that would support such a conclusion.

In *Sawyers v. State*, 724 S.W.2d 24 (Tex. Cr.App.1986), eight members of this Court approved the majority opinion that held that before it is necessary for the trial court to affirmatively instruct the jury on voluntary intoxication as mitigating evidence at the punishment stage of the trial, in accordance with the provisions of V.T. C.A., Penal Code, Section 8.04, it is first necessary that the defendant establish that the intoxication rendered him temporarily insane, i.e., his voluntary intoxication caused him (1) not to know his conduct was wrong or (2) it caused him to be incapable of conforming his conduct to the requirements of the law he violated.

Also see *Hart v. State*, 537 S.W.2d 21 (Tex.Cr.App.1976), in which this Court held that where the evidence showed that the defendant was merely voluntarily intoxicated, such did not require the submission of an affirmative instruction on temporary insanity caused by voluntary intoxication.

We have carefully read the record in this cause in order to see if there is any evidence that might have raised the issue of temporary insanity caused by intoxication, but have yet to find any such evidence, and, as mentioned, counsel for appellant does not direct our attention to any place in the record where the evidence might be interpreted to mean that appellant was

---

**3.** The trial court's charge to the jury at the punishment phase of the trial included an instruction "that in determining each of these Special Issues you may take into consideration all of the evidence submitted to you in the full trial of the case, including both the guilt and punishment phases." We find and hold that this instruction sufficiently instructed the jury, albeit indirectly, that it could consider any mitigating evidence in determining the answers to

the special issues. This instruction clearly permitted the jurors to give whatever weight they desired to any mitigating evidence that was then properly before them for their consideration. Thus, the jurors were not prohibited or precluded from considering appellant's age or his intoxication at the time of the commission of the offense. The weight to be given to those items was left strictly to their discretion.

temporarily insane by reason of voluntary intoxication when he murdered Williams.

 The trial court did not err in failing to affirmatively instruct the jury at the punishment stage of the trial in accordance with counsel for appellant's wishes. Appellant's tenth point of error is overruled.

In his eleventh and last point of error, appellant's counsel complains of statements that the prosecuting attorneys made when they argued to the jury at the punishment stage of the trial. We find that both sides during their jury arguments actually either encouraged or discouraged the jury to consider mercy or sympathy for the appellant in answering the special issues.

The prosecuting attorney who led off for the State told the jury in his argument that appellant's attorneys "will be asking you for mercy and they will be asking you to look at mitigation in this case. I am asking you as well as all the people involved in this case [are asking you] to follow your oath and base your decision not on emotional appeal, but on the facts of the case." No objection was made by either of appellant's attorneys to this argument. Thereafter, one of appellant's attorneys argued: "You can consider mercy [in deciding the special issues]." Appellant's other counsel thereafter argued with an analogy to Jesus Christ: "I am not here to ask for mercy, as [the prosecuting attorney] suggested. And you are not here to base your opinion on mercy unless we all forget that in ten days we will celebrate the birthday of a person who was executed nineteen hundred eighty-two years ago. He was shown no mercy, and I am not suggesting Joe Angel Cordova [appellant] compares in two words to [Jesus Christ], but the principles are the same." The other prosecuting attorney, in his closing remarks, argued that "the first thing that caught me or caught my attention was this idea of, we are not asking for mercy. This is exactly what I thought they were asking for. Throughout the entire voir dire, the whole questioning, the whole purpose of voir dire was to see if you could set aside your personal feelings and decide this case based upon the law and the evidence. But yet, [the defense attorneys] kept bringing up the idea of stick to your feelings." It was then that one of appellant's attorneys voiced an objection, arguing in his objection that "The jurors are to take their feelings into consideration in determining these issues." The trial judge did not rule on the objection, he, instead, merely instructed the jury that "The jury has been charged on the law and they will determine the facts, they will deliberate and decide those as they see fit."

Given the above, it is highly questionable whether what appellant's counsel says is error has been properly preserved for review. It is now axiomatic that the failure of a defendant to timely and properly object to the argument of the prosecutor relegates him to the rule that unless the argument of the prosecutor is so prejudicial that no instruction could cure the harm, the failure to object waives any error. See, for example, *Losada v. State*, 721 S.W.2d 305 (Tex.Cr.App.1986). He must also pursue that objection until he obtains a ruling from the trial judge. See *Verret v. State*, 470 S.W.2d 883, 886 (Tex.Cr.App.1971).

We will assume, however, that the issue is properly before us for review.

We find that the objected to argument should have been overruled.

We find that in principle what was stated in *Mann v. State*, 718 S.W.2d 741 (Tex.Cr. App.1986), is applicable here.

There, the issue concerned whether jurors were disqualified because of their "emotional" feelings about the death penalty. The majority opinion held that "a person may be challenged for cause based on his views on capital punishment—whether those views be 'intellectual' or 'emotional' —if those views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" The majority opinion also pointed out that when he questioned a venireman, "the prosecutor wanted to know if, as required by the oath under Article 35.22, the veniremember could base his decision on the evidence and not permit feelings alone about the death penalty generally or in relation to the defendant to change his vote." The disqualified jurors

had stated that "despite evidence proving that the death penalty was warranted, if they felt, emotionally—not based upon evidence, but strictly upon their feelings—that the defendant should not be given the death penalty, they would not answer the issues affirmatively." The majority opinion then points out the fine distinction between the prospective juror who, notwithstanding his emotions, would not reject the State's favorable evidence or would have a reasonable doubt as to the guilt of the defendant or the answers to the special issues simply on emotions, which does not disqualify him from serving in a capital murder case, and the prospective juror who states that his emotions would cause him to essentially ignore the proven facts or the law, which causes him to be subject to a State's challenge for cause. In other words, if a prospective juror makes it known that his emotions or feelings about the death penalty would control his deliberations and his answers to the special issues, despite evidence beyond a reasonable doubt that is contrary to those emotions and feelings, that person is subject to a challenge for cause by the State. Otherwise, he is not.

In this instance, we believe that the prosecuting attorneys, in both the opening argument that one of the prosecuting attorneys made, as well as the objected to argument, they were simply attempting to remind the jurors what they had told both sides during voir dire examination, that they would be fair and impartial in deciding the answers to the special issues, and would decide the special issues on the basis of the evidence and not their emotions. In short, although we find that they could have better articulated what they were attempting to say to the jurors, the prosecuting attorneys were doing nothing more than simply reminding the jurors of the above fine distinction, were also urging the jurors not to let their emotions and feelings cloud their judgments, and not be enslaved by their emotions in deciding the special issues. We find that this type argument, although it could have been better articulated, is permissible. E.g., *Alejandro v.*

*State*, 493 S.W.2d 230, 231–232 (Tex.Cr. App.1973).

Appellant's last point of error is overruled.

Having carefully reviewed all of appellant's points of error, and not having found any that would legally warrant this Court setting aside the trial court's judgment and sentence, the trial court's judgment and sentence are affirmed.

ONION, P.J., and CLINTON and CAMPBELL, JJ., concur in the result only.