# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-99-00733-CR

---

**Jimmy Ray Shelton, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT
NO. 9293, HONORABLE JOHN L. PLACKE, JUDGE PRESIDING**

---

A jury found appellant Jimmy Ray Shelton guilty of the attempted capital murders of Brian Garvel, an Elgin police officer, and Julius Matus, a Williamson County deputy sheriff, and sentenced him to ninety-nine years' confinement. *See* Tex. Penal Code Ann. §§ 15.01, 19.03(a)(1) (West 1994). He appeals, arguing the evidence is insufficient to support the verdict, the district court should have included a jury instruction on voluntary intoxication, and the district court erred in admitting, during the punishment phase of trial, several types of evidence regarding appellant's involvement with the Ku Klux Klan and other white-supremacist organizations. We will affirm the judgment of conviction and reverse and remand the portion of the judgment imposing sentence.

**Sufficiency of the Evidence**

In Shelton's first two points of error, he contends the evidence is factually and legally insufficient to support the jury's guilty verdicts because there is no evidence he shot at the officers or was guilty of anything more than evading arrest.  We disagree.

When reviewing the legal sufficiency of evidence, we view the evidence in the light most favorable to the verdict to determine whether a rational finder of fact could have found all the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Mosley v. State*, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998), *cert. denied*, 526 U.S. 1070 (1999). In reviewing factual sufficiency, we view all of the evidence in a neutral light and will reverse only if the verdict is so contrary to the overwhelming weight of the evidence as to be unjust. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000) (quoting *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996)); *Stone v. State*, 823 S.W.2d 375, 381 (Tex. App.—Austin 1992, pet. ref'd untimely filed).  The jury as trier of fact resolves any conflicts in the evidence, evaluates witness credibility, and determines the weight to be given the evidence. *Johnson*, 23 S.W.3d at 8.

At about 11:00 p.m. on March 26, 1999, a red Nissan pickup truck sped through a residential area in Taylor, Texas, passing an unmarked patrol car driven by officers from the Williamson County Sheriff's Department.  The truck failed to stop after being signaled to do so and led as many as five patrol cars on a high-speed chase from Taylor through Elgin.  Police officers estimated the truck's speed to have been as high as one-hundred or one-hundred-twenty miles an hour.  During the chase, someone in the truck began shooting at the patrol cars, hitting several of them in their front bumpers and windshields.  Police tried to pull alongside the truck at least three times, and each time the truck swerved at the patrol car, forcing it to slow down and drop behind the truck; one of those times, the truck actually rammed the police car.  When the truck finally stopped,

it had two flat tires and a third tire had been stripped completely from the wheel rim. The driver, identified at trial as Shelton, and a passenger got out of the truck and, after Shelton was subdued with pepper spray, both were arrested. A search of the truck found several rifles and knives, a book instructing the reader on how to make weapons and explosives, an inert hand grenade, numerous calibers and types of ammunition, brass knuckles, and a bull whip. The police found a semiautomatic pistol on the floorboard and a package containing 5.22 grams of methamphetamine in Shelton's clothing.

Matus, a Williamson County deputy sheriff, had joined the chase in a marked patrol car. He realized someone in the truck was shooting at him when he heard debris breaking up against his windshield. Matus testified that his patrol car was hit twice by bullets, once in the front bumper and once "dead-center in [his] windshield." Matus did not know who in the truck was shooting or if there were multiple weapons being fired from the truck.

Garvel, an Elgin Police Department police officer, had joined the chase at Elgin's city limits. He was leading the chase when he heard a gunshot and simultaneously was hit in the face and arms with glass from his windshield. After the chase he examined his car and saw that a bullet from the truck had hit the radar antenna mounted to the center of his dash. Garvel testified that after the truck stopped and Shelton got out, he had to be told repeatedly to lie down. Once on the ground, Shelton kept moving and pulling away as Garvel tried to put handcuffs on him, so Garvel sprayed him with pepper spray.

Shelton was charged with two counts of attempted capital murder. A person commits capital murder if he intentionally or knowingly causes the death of a peace officer acting in the lawful discharge of official duties and who the defendant knows is a peace officer. Tex. Penal Code Ann.

3

§ 19.03(a)(1) (West 1994). A person commits criminal attempt if, with the specific intent to commit an offense, he acts to more than merely prepare for, but fails to effect, the commission of the intended offense. Tex. Penal Code Ann. § 15.01(a) (West 1994).

The jury charge included an instruction on the law of parties, which allows the State to enlarge a defendant's criminal responsibility to acts in which he may not be the principal actor. *Goff v. State*, 931 S.W.2d 537, 544 (Tex. Crim. App. 1996); *Rivera v. State*, 990 S.W.2d 882, 887 (Tex. App.—Austin 1999, pet. ref'd). A defendant is criminally responsible for an offense committed by another if, with the intent to promote or assist in the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person in the offense. Tex. Penal Code Ann. § 7.02(a)(2) (West 1994); *Rivera*, 990 S.W.2d at 887. To establish liability as a party, the State must show that the accused had the intent to promote or assist the commission of the offense. *Lawton v. State*, 913 S.W.2d 542, 555 (Tex. Crim. App. 1995); *Rivera*, 990 S.W.2d at 887. The evidence must reflect that at the time of the offense the parties acted together, each doing some part to execute the common design. *Rivera*, 990 S.W.2d at 887. A common design can rarely be shown by direct evidence and may instead be shown by the actions of the parties before, during, and after the offense. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1996); *Rivera*, 990 S.W.2d at 887-88. Mere presence at the offense is insufficient to convict a defendant as a party; however, evidence that the defendant was present and encouraged the commission of the offense by words or deed is sufficient. *Ransom*, 920 S.W.2d at 302; *Rivera*, 990 S.W.2d at 888.

Whether viewed in the light most favorable to the verdict, or viewed neutrally, the evidence supports the jury's verdict and does not lead to a conclusion that the verdict was clearly unjust. The evidence showed that Shelton, followed by as many as five police cars with lights flashing

4

and sirens sounding, drove his truck at excessive speed for about thirty miles. Either Shelton or his passenger fired numerous shots at the police cars, striking three of the cars in their windshields and front bumpers. A gun was found on the floorboard of Shelton's truck. Shelton swerved his truck at police cars trying to draw alongside the truck, ramming one car and causing the driver to fishtail and briefly lose control. The evidence is legally and factually sufficient to show Shelton and his passenger acted with a common design, using deadly force against the officers in the chase. We overrule Shelton's first two points of error.

### Voluntary Intoxication

In his third point of error, Shelton contends the district court erred in refusing to include in the jury charge an instruction on voluntary intoxication. He claims he was entitled to the instruction because the evidence indicated he had an "aberrant mental state, apparently cause[d] by the ingestion of methamphetamine." We disagree.

Voluntary intoxication is not a defense to the commission of a crime. Tex. Penal Code Ann. § 8.04(a) (West 1994). However, evidence of temporary insanity caused by intoxication may be introduced by the defendant for the purposes of mitigation of punishment. *Id.* § 8.04(b). To be entitled to a jury instruction on voluntary intoxication, the evidence must show that the intoxication rendered the defendant temporarily insane in that (1) he did not know his conduct was wrong or (2) he was incapable of conforming his conduct to the law.[1] *Cordova v. State*, 733 S.W.2d 175, 190

---

[1]    Shelton does not point to evidence that shows he was temporarily insane. Likewise, his brief does not actually argue that he was temporarily insane; instead it argues the evidence of his "aberrant mental state" entitled him to the instruction. These oversights warrant the overruling of his point of error. *San Miguel v. State*, 864 S.W.2d 493, 496 (Tex. Crim. App. 1993). However, in the interest of justice, we will review his point.

(Tex. Crim. App. 1987). Evidence that the defendant was intoxicated at the time of the offense does not automatically entitle him to a mitigation instruction at punishment. *Miniel v. State*, 831 S.W.2d 310, 320 (Tex. Crim. App. 1992).

Dr. William Dailey evaluated Shelton and testified that when the police initially tried to make him pull over, Shelton "became frightened and speeded up and tried to drive to get away." Shelton told Dailey that he was unaware that his passenger was going to shoot at the police with a pistol that was in the truck until he heard gunfire. At that point, Shelton said, he feared he would be shot and continued to try to escape. Shelton told Dailey that at the time of the chase, he had not slept for three days and had been using amphetamines. Dailey testified that large doses of amphetamines can cause "significant behavioral disorders," including hallucinations, disorganized thinking, and problems with judgment and behavioral control. He also said the drug can cause a user to feel paranoid. Dailey said that, based on evidence that Shelton was sometimes unintelligible, unresponsive, or catatonic after his arrest, Shelton was probably experiencing sleep deprivation and drug withdrawal. Symptoms of withdrawal include glazed eyes, intermittent unresponsiveness, and irritability. Symptoms of amphetamine abuse include incoherentness, confusion, and disorganized conversation. Dailey also testified that Shelton displayed some indications of an antisocial personality disorder. Dailey admitted that much of his opinion was based on information provided by Shelton. Dailey noted in his report that Shelton may have been motivated to perform poorly on a memory test. Dailey also stated he simply reported Shelton's version of the chase; he said he did not necessarily believe that version was true. He said, "It is not intended to be a statement of what I think is actually true. It's simply the history that he provides." Dailey did not testify that at the time of the chase,

6

Shelton was so intoxicated that he was unable to tell his conduct was wrong, nor did he testify that Shelton could not, by reason of his drug use, conform his conduct to the law.

There is no evidence indicating Shelton was temporarily insane at the time of the offense. Nowhere does the evidence suggest that he did not know his conduct was wrong or that he could not conform his conduct to the law. *See Beavers v. State*, 856 S.W.2d 429, 432-33 (Tex. Crim. App. 1993) (evidence of drug abuse, addiction, childhood abuse, and retarded emotional development did not entitle defendant to instruction); *Miniel*, 831 S.W.2d at 320 (evidence of marijuana use and "shotgunning" beer did not entitle defendant to instruction); *Still v. State*, 709 S.W.2d 658, 661 (Tex. Crim. App. 1986) (evidence that defendant drank "quite a bit" on day of offense did not raise issue of temporary insanity); *Rainey v. State*, 949 S.W.2d 537, 543 (Tex. App.—Austin 1997, pet. ref'd) (evidence showed defendant was intoxicated but did not suggest he did not know right from wrong); *Madden v. State*, 628 S.W.2d 161, 162 (Tex. App.—Eastland 1982, pet. ref'd) (evidence that defendant consumed Valium and six pack of malt beer, felt he was in "walking sleep," and remembered only part of offense did not raise issue of whether he knew conduct was wrong or could not conform conduct to law). Evidence that Shelton was intoxicated at the time of the offense does not entitle him to the instruction. *Miniel*, 831 S.W.2d at 320. The district court did not err in refusing the instruction. We overrule Shelton's third point of error.

### Evidence of Shelton's Membership in Racist Organization

In his fourth point of error, Shelton argues the district court erred in admitting, during the punishment phase of the trial, evidence bearing Ku Klux Klan (KKK) and other white supremacist

7

insignias.[2]  In his fifth point of error, he argues it was error for the district court to allow testimony during the punishment phase about the nature and activities of the KKK.  Finally, in his sixth point of error, he contends the district court erred in admitting during the punishment phase evidence of his involvement in the KKK.[3]  We agree.

An individual's right to join groups and associate with others holding the same views is protected by the First Amendment.  *Dawson v. Delaware*, 503 U.S. 159, 163 (1992); *Mason v. State*, 905 S.W.2d 570, 576 (Tex. Crim. App. 1995).  However, the Constitution does not bar the admission of all evidence concerning a defendant's beliefs and associations; such evidence may be admissible if it is relevant.  *Dawson*, 503 U.S. at 166-68; *Mason*, 905 S.W.2d at 576-77.  To prove relevance, the State must show (1) proof of the group's violent and illegal activities and (2) the defendant's membership in the group.  *Dawson*, 503 U.S. at 166-67; *Mason*, 905 S.W.2d at 577.

At the punishment stage, the State introduced over Shelton's objection the following evidence:  a Confederate States of America belt buckle; three Confederate flags; a holster and knife on which "Ku Klux Klan" was written; gloves with the Confederate flag on them; a vest with KKK emblems; a Bible containing the following inscription, "Reverend Jimmy Ray Shelton, Imperial Wizard, Church of the Konfederate [sic] Ghosts, Knights of the Ku Klux Klan"; a photograph of

---

[2]  Shelton asked for and received a timely running objection to any evidence of his membership in the KKK or other such groups.  He argued that the evidence was offered for the sole purpose of prejudicing the jury against Shelton.  The State countered that the evidence was allowable character evidence, and the district court admitted the evidence.

[3]  Shelton's brief does not present argument explaining why the introduction of the evidence was reversible error.  He does not argue that the State failed to show his membership in a group involved in violent and illegal activities.  He contends the evidence only served to inflame the jury and that "[i]t can not be said that the admission of [the evidence] was harmless error in light of" the sentence imposed.  Shelton sufficiently raises the issue, and we will address his contentions.

Shelton's left hand on which is a tattoo of a spider web and black widow spider; a photograph of his chest with a tattoo of a spider and the letters "KKK"; a business card indicating Shelton was Grand Dragon of the American Knights of the KKK; and a racist joke hunting license. All of the above evidence was found in Shelton's truck, in his wallet, or on his person.

The State called Joseph Roy, Director of Intelligence for the Southern Poverty Law Center, a group involved in litigation against and education about white supremacist groups, to testify about such groups and their activities. Roy gathers information about the KKK, other "hate groups," and some militias. Roy testified that the Southern Poverty Law Center does not seek to suppress the free-speech rights of the organizations it sues, but sues when the groups "abandon their constitutionally protected activity and get involved in some kind of criminal activity or . . . civil tort."

Roy related the history of the KKK, starting right after the Civil War:

> Almost overnight it became very — a vigilante mentality set into it. There are disguises and secrecy and the rumors that were going around about them got them involved in a lot of lynchings and burnings and other criminal activity back during that time and so they disbanded the Klan because it had become so violent; but it grew so fast so quickly and it was so large that they had a life of their own and the disbandment didn't take effect and they've been with us ever since the 1860s. They probably had the largest numbers in the early 1920s, 1925, in that area. There were almost five million members nationally. You had judges and doctors and lawyers and Supreme Court Justices and even a president were in the Klan organization. . . . [In the 1920s] there was a big scandal out of Indiana where one of the national leaders got involved in a child torture murder and most of the members — had members almost overnight abandon the Klan . . . . After that there was another resurgence in growth in the 60s because of the civil rights movement and then we started on a steep decline for about five years here recently in the — in the late 80s, early 90s, and then for the last two years there's been a resurgence in growth . . . because of technology like the Internet they were able to recruit a lot more people, reach a lot more people with their information.

9

Roy testified that the KKK is a system of different organizations around the country; there are about 160 local chapters and about 50 "specifically different groups." He said the chapters are independent of one another but may interact and attend the same functions. Roy testified as follows:

Question: You've already described, Mr. Roy, that your organization targets instances where the Klan may step out of bounds outside their free speech. Is that a common occurrence or is it just a once in a great while that something might happen or some — some activity might be conducted or condoned by the Klan that would be outside the scope of what our Constitution would condone?
Roy: Well, there are a lot of — it's a lot more complicated than that before we step in with a lawsuit. We try to file a suit that will have the biggest impact on a national level and not just a localized —

Question: I'm not —

Roy: There's a number of cases where we might or might not have sued them, but we've only had like five or six various suits against these organizations.
Question: I think what my question really is geared towards is not simply what your organization would file a civil lawsuit about. I'm just asking you in general to give the jury a characterization of the Klan as to whether or not they are an organization that may or may not be likely to conduct themselves in some sort of criminal way.

Roy: Well, the Klan in general has a rich historical reputation back to the Civil War of murders and lynchings and violence, especially in the 60s. I mean, that's the guild that the Klan design and structure comes out of. I mean, it's — if you start a Klan organization that's who you're trying to — to attract to your ranks, is that type of person. It's like if you were to start a commune you wouldn't call it the Charles Manson commune unless that's the type person that you wanted in your organization and —

Question: Well, is there a profile of the typical Klan person?
Roy: Well, most clansmen without exception — and even other groups in the hate-group category fall under the same general description. These are people normally that are angry. They're frustrated. They feel like they've lost control of their life. They're looking for acceptance. They're involved in a lot of scapegoatism. They're looking for people to blame for their own failures. That's why they select blacks and Jews and Hispanics and other non-blacks [sic] as the target of their woes. I mean, these are the people that are conspiring against them or causing them all the failures in their lives.

10

They're also looking for instant empowerment. That's why weapons are so important to these extremist organizations that, you know, you have a gun and I don't. You know, the person with the gun is in charge and it gives them a feeling of acceptance. They use these titles like Exalted Cyclops and Klaliff and, you know, the list goes on and on, . . . these are people that couldn't hold a job one day and the next day they're telling people what to do. So it fulfills a big vacancy in their life and they usually fall in that range.

Roy was asked about the American Knights of the KKK and how they differ from other KKK organizations. He said the American Knights is one of the largest, fastest-growing, most active, and "hardest recruiting" KKK organization in the country. Roy said his organization had written an article about the American Knights titled, "Knights of Thuggery." He testified that:

> [T]he thing that separates the American Knights from other Klan groups is most Klan groups without exception have adopted more of a — and this may sound strange, but they have adopted a more politically correct stance or a more socially acceptable stance. They're more PR-minded. In other words, they may say we're not racist, we're racialist. We're not segregationist, we're separatist. We don't hate anybody, we just love white folks. That's the public side that you see of most Klan groups and it's business as usual on the private side, but at least they make an effort.
>
> The American Knights, one of the reasons for their success is there [sic] an in-your-face type group. They try to — they'll get permits. They'll try to — once they get police protection they'll try to reach out and target different individuals and pick on them by making — you know, if somebody is gay they'll make gay jokes; if somebody's black, they'll make black jokes; you know, whatever the case may be, to get them riled up to where the counter-protesters will respond, and they've been quite successful in it; and they do this to draw new recruits to show that they're a powerful organization. They do it to get news media coverage. I mean, that's — most any group that matches, one of the main reasons is to get coverage. There's no such thing as bad media for these groups because it gets their message out.
>
> Question: Are most of the people that have — that are in the power structure of the American Knights, are they fine, upstanding citizens or what are they like?
> Roy: Well, one of the reasons we wrote this particular article about the American Knights was because so many of their members that were in leadership roles had prior criminal records.

11

Roy went on to name several officers of the American Knights who have criminal records. He was asked, "What is the function of cross burning within the Klan?" Roy answered, "Well, a cross burning is not a Klan ceremony." Roy described some of the titles and offices within the American Knights and set out the basic power structure of the group. Roy said Shelton had been connected with the American Knights and identified as:

> Reverend Jimmy Shelton, which is a status he holds with a front group called The Church of the American Knights of the KKK. He also has been identified as the Exalted Cyclops of [a North Carolina KKK organization]; and he's also been identified as an Imperial Knight Hawk, which is a national security officer.

Roy said Shelton was reportedly banished from the group in August 1998, but a week later, he was seen handing out KKK literature with the man who runs the American Knights' national office. Roy said the national leadership usually tries to distance itself from members who are in legal trouble and such members are usually on "leave of absence." Roy did not know anything about the Konfederate Ghosts of the KKK, a group Shelton may have founded after August 1998.

Rick Lunsford, detective with the North Carolina Police Department, testified he was familiar with Shelton from observing him at KKK activities. Lunsford played for the jury a videotape compilation of Shelton's appearances at and participation in various KKK rallies.

The State clearly satisfied the second prong of the *Dawson* test, producing considerable evidence indicating Shelton's association with various Klan groups. *Dawson*, 503 U.S. at 165-66; *Mason*, 905 S.W.2d at 577. However, the State's evidence falls short of the first prong, proof of the group's violent and illegal activities. *Dawson*, 503 U.S. at 166; *Mason*, 905 S.W.2d at 577. Roy testified that the KKK had a "rich historical reputation" of violent and illegal behavior, but

12

said that was especially true some thirty to forty years ago. He further testified that the American Knights was a separate organization from the KKK, and that it gets permits to hold rallies and then, through inflammatory language, incites counter-protesters to react violently. In essence, Roy testified that the American Knights' behavior is obnoxious but legal and permitted. Roy never testified that the American Knights goes beyond its permitted rallies to commit violent or illegal activities. The State's evidence does not satisfy *Dawson's* first prong, and the evidence appears to have been introduced "simply because the jury would find these beliefs morally reprehensible." *Dawson*, 503 U.S. at 167 (State introduced only vague stipulation of group's abstract beliefs; no proof group had committed or endorsed illegal and violent acts); *see, e.g., Mason*, 905 S.W.2d at 577 (evidence of defendant's membership in group involved in illegal drugs, prostitution, weapons manufacture, contract killings, and assaults); *Beasley v. State*, 902 S.W.2d 452, 456 (Tex. Crim. App. 1995) (evidence of membership in gang involved in "violent and criminal behavior, such as 'drug trafficking, robberies, and witness intimidation'"); *Fuller v. State*, 829 S.W.2d 191, 196 (Tex. Crim. App. 1992) (evidence that group was "not law-abiding," used intimidation and fear, and had violence as "main function," but State did not prove defendant's membership); *Aguilar v. State*, 29 S.W.3d 268, 270 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (evidence of defendant's membership in "criminal street gang").

As demonstrated by a review of the above cases, the State's evidence does not satisfy the standard for admissibility set out by the Supreme Court and the court of criminal appeals. The State did not prove that the KKK or the American Knights, during a relevant time period, had committed unlawful or violent acts or had endorsed such acts. *See Dawson*, 503 U.S. at 166. The evidence of Shelton's involvement with these groups was not tied in any way to his crime. *See id.*

13

There is no evidence that elements of racial hatred were involved in Shelton's crime. *See id.* Like the Supreme Court in *Dawson*, we must conclude that Shelton's First Amendment rights were violated by the admission of the KKK evidence, because the evidence proved nothing more than Shelton's abstract beliefs. *Id.* at 167. It was not relevant to prove any aggravating circumstances. *See id.* We are left with no choice but to sustain Shelton's fourth, fifth, and sixth points of error.

Constitutional error directly offends the United States or Texas constitutions without regard to any statute or rule that may apply. *Tate v. State*, 988 S.W.2d 887, 890 (Tex. App.—Austin 1999, pet. ref'd). Constitutional error requires reversal unless we determine beyond a reasonable doubt that the error did not contribute to the punishment. Tex. R. App. P. 44.2(a); *Tate*, 988 S.W.2d at 889. Non-constitutional error requires reversal if we determine it affected the defendant's substantial rights. Tex. R. App. P. 44.2(b); *Tate*, 988 S.W.2d at 889. Considering the range of punishment available to the jury, five to ninety-nine years, and the sentence imposed, ninety-nine years, we are not assured that, whether constitutional or non-constitutional, the error did not contribute to the punishment or affect Shelton's substantial rights. Tex. Penal Code Ann. § 12.32(a) (West 1994).

We therefore reverse the portion of the judgment imposing sentence. We affirm the judgment of conviction as to the finding of guilt. The portion of the judgment imposing punishment is reversed and remanded to the district court for further proceedings. Tex. Code Crim. Proc. Ann. art. 44.29(b) (West Supp. 2001).

14

Lee Yeakel, Justice

Before Justices Kidd; Yeakel and Jones[*]

Affirmed in Part, Reversed and Remanded in Part

Filed:   February 28, 2001

Publish

[*]   Before J. Woodfin Jones, Justice (former), Third Court of Appeals, sitting by assignment.  *See* Tex. Gov't Code Ann. § 75.003(a)(1) (West 1998).

15