# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00529-CR

**Juan Antonio Ramirez, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
## NO. 2030230, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant, Juan Antonio Ramirez, guilty of the offense of murder. *See* Tex. Pen. Code Ann. § 19.02(b)(1) (West 2003). Ramirez asserts that the evidence is factually insufficient to support his conviction. He also contends that the district court erred by failing to clarify its charge on the issue of voluntary intoxication during the guilt-innocence phase of the trial and by not instructing the jury on voluntary intoxication during the punishment phase of the trial. We will affirm the judgment of the district court.

## BACKGROUND

On the evening of January 16, 2003, Officer Eric Bilson of the Austin Police Department responded to a "nature unknown" call at 7508 Providence Avenue. The call indicated that someone may have been injured. Upon arriving at the location, Bilson noticed a blood trail

leading away from the opened front door of the residence. When other officers arrived at the scene, Bilson entered the duplex, where he observed blood on the living room floor and on the couch. After determining that there was no one inside, Bilson began to rope off the area.

Another officer, Jeffrey Page, arrived at the crime scene immediately after Bilson. He first noticed a body lying on the ground across the street and went over to examine it. He observed that the person appeared dead and that his shirt was cut and bloody. Page left another officer to take care of the body, and then went inside the duplex to assist Bilson. The first thing he noticed inside was a large butcher knife on the couch in the living room. A second knife was found in the yard outside the duplex.

As Bilson returned to his patrol car after securing the crime scene, a pickup truck drove up to him. The two men inside, Antonio Martinez and Ildiberto Vargas, told Bilson that they were witnesses to the crime. Bilson noticed that there was blood on the driver's side of the vehicle, so he roped off the truck as part of the crime scene and detained the witnesses. Martinez and Vargas told the police that Juan Ramirez was the perpetrator, and the police began looking for him.

Officer Andrew Waters found Ramirez later that night. Waters was driving to the crime scene and noticed a person matching Ramirez's description walking along St. John's Avenue. Waters drove past him, stopped, and then waited until Ramirez walked up to him. Waters asked Ramirez some questions, determined that he might be intoxicated, and arrested him for public intoxication. Ramirez was taken to Brackenridge Hospital where he was treated for cuts on his right hand; he had no other injuries.

At approximately 1:30 a.m., less than 90 minutes after the incident allegedly occurred, Detective Douglas Skolaut arrived at the crime scene to investigate the physical evidence. The first

2

piece of evidence he examined was the pickup truck, and he documented the various spots on the truck where there were blood drops and blood smears. He also documented blood smears on and around a nearby van. Skolaut next approached the victim and observed that he had been stabbed multiple times in the chest area. Skolaut also investigated the duplex and, based on the blood evidence inside, determined that a violent incident had begun on the couch in the living room. He also noticed evidence that the occupants of the duplex had been drinking alcohol, including a shot glass and a half empty bottle of brandy.

The victim was later identified as Domingo Salgado. An autopsy conducted on Salgado revealed a total of thirty-seven different stab wounds on his face, chest, extremities, and abdomen that had come from several directions—front to back, downward, upward, to the left, and to the right. Several of the stab wounds went through his heart and one of his lungs. Toxicology tests were also conducted on Salgado, and they revealed that his blood alcohol level was .24, which, according to the testimony of medical examiner Dr. Elizabeth Peacock, meant that Salgado was "quite intoxicated" at the time of his death. No other drugs were present in his system. A medical examiner testified that the multiple stab wounds caused Salgado's death.

On March 26, 2003, Ramirez was charged with Salgado's murder. A jury found Ramirez guilty and the district court assessed his punishment at 60 years' confinement. This appeal followed.

## DISCUSSION

In four issues on appeal, Ramirez asserts that: (1) the evidence is factually insufficient to support his conviction; (2) the district court failed to supplement the jury charge during guilt-

3

innocence to clarify the issue of voluntary intoxication; and (3) and (4) the district court erred in failing to instruct or inform the jury during punishment on the issue of voluntary intoxication.

**Factual sufficiency**

### *Standard of review*

When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004). In a factual sufficiency review, we consider all the evidence equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). We consider all the evidence, rightly or wrongly admitted. *See Camarillo v. State*, 82 S.W.3d 529, 537 (Tex. App.—Austin 2002, no pet.). Although due deference still must be accorded the fact-finder's determinations, particularly those concerning the weight and credibility of the evidence, we may disagree with the result to prevent a manifest injustice. *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000). We will deem the evidence factually insufficient to sustain the conviction if the proof of guilt is too weak or the contrary evidence is too strong to support a finding of guilt beyond a reasonable doubt. *Zuniga*, 144 S.W.3d at 484-85.

### *Application*

To prove Ramirez guilty of murder, the State was required to prove beyond a reasonable doubt that Ramirez intentionally or knowingly caused the death of Salgado. Tex. Pen. Code Ann. § 19.02(b)(1) (West 2003).

Two witnesses, Martinez and Vargas, both testified to seeing Ramirez attack, chase, and stab Salgado multiple times with a knife. Ramirez contends, however, that "the physical evidence does not conform to the testimony of the [S]tate's witnesses." Specifically, Ramirez asserts that there are inconsistencies in the testimony of Martinez and Vargas and that his own testimony, suggesting that he stabbed the victim in self-defense, is more consistent with the physical evidence.

*The testimony of Martinez and Vargas*

Martinez and Vargas testified that on the night of the offense, they were socializing at a duplex with three co-workers: Ramirez, Salgado, and a man named Tomas. All but Vargas lived together in the duplex and would often socialize and drink there after work. On this particular evening, Ramirez, Salgado, and Tomas were drinking brandy. Salgado and Tomas were mixing the brandy with cola, but Ramirez was drinking it "straight."

Around midnight, the men were in the living room and still drinking. Ramirez, Salgado, and Tomas began having a discussion about who could drink the most. The disagreement escalated into a fight. Salgado challenged Ramirez to drink more, but Ramirez repeatedly refused. Salgado eventually stood up and kicked Ramirez in the foot. Ramirez responded by "jumping" Salgado and hitting him with his fist. Martinez grabbed Ramirez and Vargas grabbed Salgado, separating the two. Salgado sat down on the couch while Ramirez went into the kitchen, where he retrieved two knives. He emerged from the kitchen with a knife in each hand. Vargas tried to calm him down, but Ramirez attempted to stab Vargas, who then ran outside and sought safety in his truck. Tomas also ran outside. Ramirez then lunged at Salgado and stabbed him in the chest several

5

times.  Martinez yelled at Ramirez to stop and yelled at Salgado to run.  Salgado was able to run out of the duplex, but Ramirez chased after him with at least one knife still in his hand.

Martinez then ran outside and watched as Ramirez continued to chase Salgado, who was running around the parking lot trying to escape.  Martinez continued to yell at Ramirez to stop, but to no avail.  At one point, Salgado attempted to get in the truck with Vargas, but he didn't have enough time because Ramirez was too close behind him.  As he was chasing Salgado around Vargas's truck, Ramirez tried to stab at Vargas through the window.  Ramirez then began to chase Martinez, but Martinez jumped in the bed of Vargas's truck, which was still parked outside the duplex.

Ramirez resumed his pursuit of Salgado, and eventually caught him.  Salgado collapsed on the ground and Ramirez knelt in front of him, stabbing him repeatedly.  Every time Salgado would try to get up, Ramirez would knock or kick him down and start stabbing him again.  Finally, Ramirez kicked Salgado "with everything he had" and Salgado did not get up.  At this point Martinez and Vargas drove away.  They returned when the police arrived.

Ramirez asserts that there are some inconsistencies in the testimony of Martinez and Vargas.  First, both Martinez and Vargas testified that Ramirez was holding more than one knife when he was chasing Salgado outside the duplex.  However, the police found only one knife outside the duplex; the police found the other knife on the couch in the living room.  This fact suggests the possibility that Ramirez was holding only one knife when he was chasing Salgado.  Another inconsistency related to how the police were notified about the crime—Vargas testified to using his cellular phone to call the police, while Martinez testified that he called his wife from a Home Depot so that she could call the owner of the duplex, who would call the police.  A third inconsistency is

6

the sequence in which Vargas and Martinez ran out of the duplex. Martinez testified that he was the last person to leave, while Vargas testified that Martinez ran out immediately after him.

We conclude, however, that a rational jury could find that these inconsistencies had no bearing on the ultimate issue of whether Ramirez murdered Salgado. Martinez and Vargas were consistent on the facts that were essential to the State's charge—both testified to seeing Ramirez attack, chase, and stab Salgado multiple times with a knife.

Furthermore, the version of the facts presented by Martinez and Vargas was consistent with the physical evidence obtained at the crime scene. Martinez and Vargas testified that Ramirez chased Salgado around Vargas's truck and other vehicles; blood was found around Vargas's truck and other vehicles. Martinez and Vargas testified that Salgado ran to a grassy area where Ramirez proceeded to stab him multiple times; the police found Salgado's body on the ground in the area they described. Also, the blood evidence found in the duplex was consistent with their testimony that Ramirez's attack on Salgado began on the couch. Finally, a medical examiner testified that Salgado was stabbed multiple times from various directions, which is consistent with their description of Ramirez's repeated stabbings of Salgado.

*The testimony of Ramirez*

Ramirez testified in his own defense, and presented a different version of the events. According to Ramirez, the incident began when Salgado slapped Tomas in the face. Before Salgado and Tomas could start fighting each other, Vargas, Martinez and Ramirez separated the two. After everyone had settled down, Tomas began provoking Salgado. Vargas, Martinez, and Ramirez again attempted to defuse the situation. Salgado, however, got up to fight Tomas, and Ramirez had to grab

7

him to prevent another altercation. After this, according to Ramirez, Tomas went to the bathroom and Salgado went to the kitchen.

Salgado then returned to the living room with his hands behind his back. Unbeknownst to Ramirez, Salgado was holding a knife. Ramirez testified that Salgado attempted to stab him in the back, but the knife only grazed him. Ramirez then fell to the floor, and Salgado attempted to stab him again. Ramirez put his hands out to defend himself, and Salgado cut Ramirez's hand. Salgado then fell onto the couch and Ramirez lunged at him and struggled with him for the knife. While Salgado was still holding the knife, Ramirez turned it toward Salgado and stabbed him in the stomach. Ramirez then saw Martinez and Vargas run out of the duplex, but Ramirez never saw Tomas leave the bathroom. Ramirez testified that he then left the duplex and walked for several blocks. He walked aimlessly in different directions and at one point sat down on a park bench to calm himself down. He did not know how long he was sitting there. He eventually resumed walking, at which time he encountered Officer Waters.

On cross-examination, Ramirez testified that he only stabbed Salgado twice, both times in self-defense, and he speculated that Tomas murdered Salgado after Ramirez and the others were gone. Ramirez also asserts in his brief that Tomas had a motive to "finish off" the victim, presumably because Salgado was provoking Tomas in the same way he was provoking Ramirez. However, other than Ramirez's testimony, there is no evidence in the record suggesting that Tomas had anything to do with Salgado's murder. Martinez even testified that Tomas ignored Salgado and told him that "I drink what I can drink."

Ramirez claims that his version of the events more accurately conforms to the physical evidence. We disagree. The only pieces of evidence that could possibly support his theory

of self-defense are State's Exhibits 110 and 111, which show cuts to Ramirez's hand. However, the cuts on Ramirez's hand were just as consistent with the State's theory that Ramirez's hand slipped onto the blade of the knife as he stabbed Salgado. The exhibits establish only that appellant was injured during the incident—they do not establish how he was injured. Much of the other physical evidence—the blood trail leading away from the duplex, the blood found around Vargas's truck and the surrounding vehicles, the location of Salgado's body, and the multiple stab wounds from different directions in different locations on Salgado's body—does not support the version of events described by Ramirez.

It is the exclusive province of the jury to determine whether Ramirez's version of the events is more or less credible than the version presented by Martinez and Vargas. *See Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981). There is nothing in the record to suggest that it was irrational for the jury to reject the testimony of Ramirez and accept the testimony of Martinez and Vargas.

Considering all the evidence in a neutral light, the jury was rationally justified in finding guilt beyond a reasonable doubt. *Zuniga*, 144 S.W.3d at 484 We overrule Ramirez's first issue.

**Instruction on voluntary intoxication in guilt-innocence phase**

In his second issue, Ramirez asserts that during the guilt-innocence phase of trial the district court erred in failing to supplement the jury charge to clarify an alleged inconsistency in the instructions.

The jury was apparently confused about whether it could consider voluntary intoxication when determining Ramirez's culpability. The charge stated in relevant part: "You are further instructed that voluntary intoxication does not constitute a defense to the commission of a crime. 'Intoxication' means disturbance of mental or physical capacity resulting from the introduction of any substance into the body." It also instructed the jury regarding culpability: "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result."

During its deliberations, the jury sent a note to the court containing the following question:

> There is evidence suggesting the defendant's intoxication, perhaps to the point of the defendant being unaware of consequences of his actions. Yet we're unable to consider voluntary intoxication as a defense. This seems contradiction to some and we have the question how do we consider possible awareness impairment and at the same time not consider it (because of its being caused by voluntary intoxication)? [sic]

The jury received the following answer: "The Court refers you to the Charge, which contains all of the law the Court can legally provide to you in this case. You are bound by the instructions that are contained in the Court's Charge." Ramirez asserts in his brief that it was error for the court not to clarify the "inherent inconsistency" in the charge.

Ramirez failed to preserve this complaint. At trial, he neither sought clarification of the portion of the court's charge addressing voluntary intoxication, nor did he object to the court's instruction in response. We will, therefore, reverse the judgment only if the charge was incorrect and resulted in egregious harm. *Pickens v. State*, 165 S.W.3d 675, 680 (Tex. Crim. App. 2005);

10

*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App 1984). The charge accurately tracks the language of the penal code, *see* Tex. Pen. Code Ann. § 8.04(a) (West 2003), and there is nothing in the record to support a finding that, in this case, tracking the language of the penal code was insufficient. We overrule Ramirez's second issue.

**Instruction on voluntary intoxication during punishment phase**

In his third and fourth issues, Ramirez asserts that the district court erred in failing to instruct or inform the jury regarding voluntary intoxication during the punishment phase of trial.

During the charge conference at the punishment phase of the trial, Ramirez requested an instruction on voluntary intoxication pursuant to section 8.04(b) of the penal code, which provides that "evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried." *Id*. § 8.04(b). The district court denied Ramirez's request, but informed him that he was free to argue that "intoxication may be mitigation" in his closing argument.

When temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was caused by intoxication, the court shall charge the jury accordingly. *Id*. at § 8.04(c). To be entitled to such an instruction, however, the evidence must show that the intoxication rendered the defendant temporarily insane in that (1) he did not know his conduct was wrong or (2) he was incapable of conforming his conduct to the law. *Cordova v. State,* 733 S.W.2d 175, 190 (Tex. Crim. App. 1987); *Shelton v. State*, 41 S.W.3d 208, 213 (Tex. App.—Austin 2001, pet. ref'd). Evidence that the defendant was intoxicated at the time of the offense does not

11

automatically entitle him to a mitigation instruction at punishment. *Miniel v. State*, 831 S.W.2d 310, 320 (Tex. Crim. App. 1992); *Shelton*, 41 S.W.3d at 213.

To prove temporary insanity by intoxication, a defendant has to show more than intoxication; he has to present evidence that either the intoxication made him unaware that what he was doing was wrong, or it made him incapable of conforming his conduct to the law. *See Cordova*, 733 S.W.2d at 190. Ramirez presented evidence of intoxication,[1] but he failed to present evidence that, because of his intoxication, he did not know his conduct was wrong or he was incapable of conforming his conduct to the law.[2] Because he failed to present evidence of temporary insanity,

---

[1] Ramirez, Martinez, and Vargas all testified that Ramirez had been drinking that night. Also, Officer Waters testified that Ramirez appeared intoxicated when he arrested him.

[2] The only evidence in the record even suggesting that Ramirez might have been "crazy" came in during the cross-examination of Vargas:

Q: One of the things that in talking about this incident that you told the police was that when you saw Juan stab Domingo in the room, you saw that he continued to stab him, you told the police that you saw that you thought like [Ramirez] had gone crazy.

A: Well, yeah. I would talk to him, and how do I say it, he wouldn't pay attention to anybody.

Q: He didn't respond to anybody?

A: No.

Q: And you thought that, you know, he was going to try to kill all of you?

A: Well, yeah.

However, evidence that Ramirez may have been "crazy drunk" at the time of the offense does not entitle him to an instruction on temporary insanity. *See Cordova v. State*, 733 S.W.2d 175, 190 (Tex. Crim. App. 1987). Ramirez needed to present evidence that he did not know his conduct was wrong or that he was incapable of conforming his conduct to the law. *Id*. He failed to do so.

12

Ramirez was not entitled to a mitigating instruction on voluntary intoxication during punishment. We overrule Ramirez's third and fourth issues.

## CONCLUSION

Having overruled all of Ramirez's issues on appeal, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed:   April 21, 2006

Do Not Publish