Opinion filed February 17,
2011

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-09-00140-CR

                                                    __________

 

                                      Conrad Lilly, Appellant

                                                                 
V.

                                         
STATE OF TEXAS, Appellee



 

                                   On
Appeal from the 259th District Court

                                                             Jones
County, Texas

                                                       Trial
Court Cause No. 9915

 



 

O
P I N I O N

Conrad
Lilly was indicted on two counts of assault on a public servant.  After the
trial court denied his motion to transfer the proceedings to a public
courthouse, Lilly pleaded guilty and was sentenced to six years in prison.  We
affirm.

I.  Background Facts

Lilly
was arraigned in the chapel of the French Robertson Unit of the Texas Department
of Criminal Justice.  The chapel had Bibles and a stained glass window with a
cross and a representation of the Ten Commandments.  Lilly learned that the
next hearing in his case would also be held at the prison’s chapel, and he
filed a plea to the jurisdiction and a motion to transfer the proceedings to a
public courthouse.  Lilly argued that having hearings at the prison deprived
him of his right to a public trial and that having them in a chapel violated
the First Amendment.[1]

The
French Robertson Unit is in Jones County and is approximately thirty-six miles
from Anson, the county seat.  Until the early 1990s, groups of inmates charged
with committing offenses while in prison were bused to the Jones County Courthouse
for arraignment and other nonjury proceedings.  The bus and other prison vehicles
blocked the entire north side of the courthouse.  Because there was no holding
cell in the courthouse, one inmate at a time was taken out of the bus and into
the courtroom to attend his hearing.  After his hearing, the inmate was taken
back to the bus to wait.  Escorting an inmate to and from the courtroom required
at least two TDCJ guards.  Armed TDCJ guards were also posted around the
outside of the courthouse, on each floor of the courthouse, and within the
courtroom itself.  This situation not only posed security concerns, it also
alarmed local residents.

District
courts must hold regular terms of court at the county seat of each county in their
district except as otherwise provided by law.  Tex. Const. art. V, § 7.  A county with a population of less
than 30,000 may maintain a branch courthouse outside the county seat and may
conduct any function that it is authorized to conduct at the main courthouse.  Tex. Loc. Gov’t Code Ann. § 292.0231
(Vernon 2005).  Jones County has a population of 19,295.  In the early 1990s, the
county commissioner’s court designated the French Robertson Unit Chapel a
branch courthouse, and the State began conducting inmate proceedings there.

To
enter the French Robertson Unit, visitors pass through a highway gate and a
front gate.  Prison guards check identification at both gates.  Erica Whitney
was working the front gate on the morning of Lilly’s hearing.  She testified
that only people who had been approved by the warden were allowed to enter the
Unit.  She stated that each inmate was allowed a maximum of ten people on his
visitors list and that this list could only be changed every six months.  A
person not on the visitors list would not have the warden’s approval to enter. 
Furthermore, unaccompanied minors and former inmates within two years of their
release were not allowed to enter.  Officer Mullins was working the highway gate
on the morning of the hearing.  He testified that, in theory, a member of the
public who wanted to attend a court proceeding could do so if he or she had the
warden’s approval to enter the Unit.  Warden Cary Cook agreed that, if a person
was on an inmate’s visitors list, he or she could enter after being screened. 
If any member of the media, or someone not on an inmate’s visitors list,
requested permission to attend a court proceeding, the warden would have to
call TDCJ administration in Huntsville to get further clarification.  No one
could recall anyone ever making such a request.  Warden Cook stated that it
would, therefore, be hard to say what would happen if someone did.

Getting
to the prison chapel also requires going through a double fence with razor wire
and three locked metal doors.  Visitors must take off their shoes, belts, and
watches and pass through a metal detector.  Visitors are then frisked.  Many
items are not allowed in the Unit, such as cell phones, cash over twenty
dollars, clothing with profane language, and metal objects capable of causing a
threat to unit safety or security.

Warden
Cook testified that, in his opinion, a member of the public attending a court
hearing at the chapel would be safer than the general public would be if the
inmate’s hearing were held at the Jones County Courthouse.  However, he
acknowledged that there would be a potential difference between the two
locations in a hostage situation.  Warden Cook explained that an inmate would
not be allowed to leave the Unit with a hostage.  Every effort would be made to
negotiate with the inmate, but he could not secure his release by threatening a
hostage’s life.

Jones
County Constable Darrell North is the trial court’s bailiff.  In contrast to
the Unit’s access rules, people who attend trials at the courthouse do not have
to present an ID card or sign in before entering the courtroom, and they can
carry as much cash as they wish.  Additionally, minors are allowed so long as
they are not disruptive.

The
trial court denied Lilly’s plea to the jurisdiction and his motion to transfer.
 Lilly then reached an agreement with the State and pleaded guilty to a third
degree felony.  The trial court certified his right to appeal the pretrial
rulings.

II.  Issues

Lilly
raises two issues on appeal.  First, he argues that the trial court denied him
his constitutional right to a public trial by holding his criminal proceedings
at the prison.  Second, he maintains that the trial court violated the
Establishment Clause and the Free Exercise Clause of the First Amendment of the
U.S. Constitution as well as Article I, section 6 of the Texas Constitution by
holding criminal proceedings in a chapel.

III.  Did the Trial Court Err
by Conducting Court Proceedings at the Prison?

The
Constitution of the United States, the Texas Constitution, and the Texas Code
of Criminal Procedure all guarantee an accused the right to a public trial.  U.S. Const. amend. VI;  Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 1.24 (Vernon
2005). This right prevents the abuse of judicial power, discourages perjury,
encourages unidentified potential witnesses to come forward, and instills in
the public the perception that the courts are acting fairly.  Richmond
Newspapers, Inc. v. Virginia, 448 U.S. 555, 569-71 (1980).  The
constitutional right to a public trial has been extended to some pretrial
proceedings as well.  See Presley v. Georgia, 130 S.Ct. 721, 724 (2010) (per
curiam) (voir dire); Waller v. Georgia, 467 U.S. 39, 48 (1984) (suppression
hearing).

Lilly
argues that holding his trial at the Unit denied him his constitutional right
to a public trial, and in the process, he challenges the constitutionality of Tex. Gov’t Code Ann. § 24.012(e)
(Vernon 2004).  This provision permits a district court judge to hear a nonjury
matter relating to a civil or criminal case at a correctional facility in the
county in which the case is filed or prosecuted if the party to the case or the
criminal defendant is confined in the correctional facility.  A “correctional
facility” includes a confinement facility operated by or under contract with the
Texas Department of Criminal Justice.  Section 24.012(e); Tex. Penal Code Ann. § 1.07(a)(14)(B),
(C) (Vernon Supp. 2010).

When
reviewing the constitutionality of a statute, we presume that it is valid and
that the legislature acted reasonably by enacting it.  Rodriguez v. State,
93 S.W.3d 60, 69 (Tex. Crim. App. 2002); see also Tex. Gov’t Code Ann. § 311.021 (Vernon 2005).  The person
challenging the statute must prove its unconstitutionality.  Rodriguez,
93 S.W.3d at 69.  Normally, they must also prove harm, but errors
labeled by the United States Supreme Court as structural errors are exempt from
harm analysis.  Gray v. State, 159 S.W.3d 95, 96-97 (Tex. Crim. App.
2005).   Structural errors are constitutional violations “affecting the
framework within which the trial proceeds, rather than simply an error in the
trial process itself.”  Arizona v. Fulminante, 499 U.S. 279, 310 (1991). 
The United States Supreme Court has identified the violation of the right to a
public trial as one of the limited classes of cases constituting structural
error.  Johnson v. United States, 520 U.S. 461, 468-69 (1997).

Typically,
the violation of the right to a public trial occurs when the trial court takes
affirmative action excluding the public or specific individuals from court
proceedings. See Presley, 130 S.Ct. at 722 (lone observer ordered to
leave voir dire); Waller, 467 U.S. at 42 (suppression hearing closed to
all persons other than witnesses, court personnel, the parties, and the
lawyers); Andrade v. State, 246 S.W.3d 217, 225 (Tex. App.—Houston [14th
Dist] 2007, pet. ref’d) (defense counsel was ejected from the courtroom for arguing);
Mosby v. State, 703 S.W.2d 714, 716 (Tex. App.—Corpus Christi 1985, no
pet.) (members of the public were excluded during the examination of an eleven-year-old
witness to the sexual abuse of a child).

Lilly
does not claim that anyone affirmatively excluded the public from attending his
or any other court proceedings.  Rather, Lilly contends that court proceedings
conducted at a prison are, by definition, not open to the public.  In support
of this position, he cites three cases from the United States Supreme Court: Gannett
Co. v. DePasquale, 443 U.S. 368 (1979); Jones v. North Carolina
Prisoners’ Labor Union, Inc., 433 U.S. 119 (1977); and Adderley v.
Florida, 385 U.S. 39 (1966).

In
Gannett, the Court was confronted with claims by journalists that they
had been improperly excluded from a criminal trial.  A murder investigation
received considerable attention from local newspapers.  Three individuals were
ultimately arrested, and two were charged with murder.  The murder defendants
filed a motion to suppress and, at the suppression hearing, asked the trial
court to exclude the press and public because the press coverage was
jeopardizing their ability to receive a fair trial.  The district attorney did
not oppose the request, and the trial court granted it.  443 U.S. at 375.  The
journalists argued that, even if it was appropriate to exclude the public, they
had a superior constitutional right under the First and Fourteenth Amendments
to attend all criminal trials.  They acknowledged that the Court had previously
held that the press had no greater right of access to prisons than the public
but argued that there was a distinction between prisons and courts because
courts were considered a public forum and prisons were not.  The Supreme Court
refused to determine if there was a difference between the journalists’ right
of access to a trial and their right of access to a prison and held that, even
if they had a constitutional right to attend all criminal trials, this right
was secondary to the defendants’ right to a fair trial.  443 U.S. 392-93 n.24.

In
Adderley, a group of student demonstrators entered unannounced onto the
grounds of a jail to protest the arrest of fellow students and were, themselves,
arrested for trespass.   385 U.S. at 40-41.  The protestors argued that their
actions were analogous to protests on the grounds of a state capitol, which were
protected from prosecution for breach of the peace in Edwards v. South
Carolina, 372 U.S. 229 (1963), and Cox v. Louisiana, 379 U.S. 536
(1965).  In upholding their trespass convictions, the Court pointed out that
“[t]raditionally, state capitol grounds are open to the public.  Jails, built
for security purposes, are not.” 385 U.S. at 41.  In Jones, the Court
held that a prison was not a public forum and that prison authorities could
regulate bulk mailing and meetings among inmates so long as there was a rational
basis for the regulation.  433 U.S. at 133-34.  

Gannett
has no bearing on the question before us.  Adderley and Jones
both stand for the proposition that prisons are secure locations and,
therefore, that the State has more authority to regulate or restrict speech there
than it does at more public forums.  This includes the authority to limit
access.  But the authority to maintain a secure facility is not dispositive of Lilly’s
complaint because it does not account for the State’s exercise of this authority.
 See Levine v. United States, 362 U.S. 610, 616-17 (1960) (whether an
accused has been denied the right to a public trial is determined on the
particular circumstances of each case).  For example, if the State restricts
unit visitors but not courtroom observers, no violation is shown.  Conversely,
if the State prevents the media or members of the public from attending trials,
the right to a public trial is implicated.[2] 
Because the answer to this question turns on the State’s actions, we cannot
conclude, as a matter of law, that trials at prisons are or are not public
trials.  Instead, this issue must be addressed based upon the facts of each
case.

Lilly
offered no evidence that anyone was prevented from attending his trial.  The
public was given notice that judicial proceedings would take place at the
prison – the docket was filed and posted by the trial court’s coordinator
almost one month previously.  There was some dispute among the witnesses as to
whether a member of the public not on an inmate’s visitors list could attend prison
court proceedings, and Warden Cook eventually admitted that he did not know how
the prison would handle such a situation because no one had ever asked to do so.
 But of equal import was Warden Cook’s testimony that, if anyone did, he would
call TDCJ administration for guidance.  Unless, and until, someone is actually prohibited
from attending a trial, it would be speculative to conclude that they could
not.

There
was also no evidence that anyone was dissuaded from attempting to attend
Lilly’s trial because of its location.  Lilly makes much of the Unit’s visitor
restrictions.  Regrettably, heightened courthouse security procedures are
becoming more commonplace at courthouses.[3] 
But undeniably, the Unit uses heightened security measures in comparison to those
normally employed at the courthouse.  However, heightened security
measures do not necessarily deprive a defendant of a public trial.  See
Hernandez v. State, 914 S.W.2d 218, 221-22 (Tex. App.—El Paso 1996,
pet. ref’d) (defendant was not deprived of a public trial when trial court
required those in attendance to be photographed due to concerns about gang
violence, even when one person testified that she chose not to attend because of
these measures).  It should also be noted that, if Lilly’s trial had taken
place at the courthouse, normal security protocol would not have been followed. 
In the past, the State stationed armed prison guards outside the courthouse, on
each floor of the courthouse, and in the courtroom.  The Unit’s security
procedures do not obviate the need for some evidence that people were prevented
from attending Lilly’s trial because of its location.  Because Lilly produced
no such evidence, he did not carry his burden to prove that Section 24.012(e)
is unconstitutional.

Lilly
also alleges that the Equal Protection Clause was violated by conducting
nonjury proceedings involving inmates at the prison.  Inmates are not a suspect
class; their equal protection claims, therefore, must be reviewed under a
rational basis standard.  Garcia v. Dretke, 388 F.3d 496, 499 (5th Cir.
2004).  Under this standard, disparate treatment will be upheld if it furthers
a legitimate governmental interest.  Id.   The record indicates that
Jones County decided to conduct judicial proceedings at the prison because of
safety and security concerns.  This is a legitimate governmental interest. 
Consequently, the Equal Protection Clause was not violated.   Lilly’s first
issue is overruled.

IV.  Did the Trial Court
Err by Conducting Criminal Proceedings in the Chapel?

Lilly
next contends that the trial court erred by conducting criminal proceedings in the
chapel because this violated the Establishment Clause and the Free Exercise Clause
of the First Amendment and Article I, section 6 of the Texas Constitution.  Because
Lilly offers no argument or authority that the protection provided by the Texas
Constitution differs from that provided by the United States Constitution, we
need not address his Texas constitutional claims.  Muniz v. State, 851
S.W.2d 238, 251 (Tex. Crim. App. 1993).  Similarly, while Lilly alleges a Free
Exercise Clause violation, he cites to no authority in support of this argument. 
It is, therefore, waived.  Tex. R. App.
P. 38.1(i).  The question, thus, is whether the State violated the
Establishment Clause.

The
State responds that Lilly lacks standing because he asserted no personal injury
caused by holding his proceedings in the chapel.  Whether Lilly actually
suffered harm is a relevant inquiry, but because Lilly is challenging his
conviction, he has standing to complain about the procedures used to secure
that conviction, including the use of the chapel as a courtroom.

The
First Amendment, as incorporated by the Fourteenth Amendment, prohibits the
states from making any law respecting an establishment of religion or prohibiting
the free exercise thereof.  See Everson v. Board of Educ. of Ewing Tp.,
330 U.S. 1, 8 (1947).  To determine the scope of this prohibition, we look
first to the Supreme Court.  Unfortunately, the Supreme Court’s Establishment
Clause jurisprudence has been less than clear or consistent.  See Van Orden
v. Perry, 545 U.S. 677, 692 (2005) (Scalia, J., concurring) (joining the
plurality opinion “because I think it accurately reflects our current
Establishment Clause jurisprudence – or at least the Establishment Clause
jurisprudence we currently apply some of the time.”).  The Supreme Court has sometimes
evaluated Establishment Clause claims using the three-prong test set forth in Lemon
v. Kurtzman, 403 U.S. 602, 612-13 (1971).  Under this test, the government
action must first have a secular purpose; second, its principal effect must
neither advance nor inhibit religion; and third, the action must not foster an excessive
governmental entanglement with religion.  403 U.S. at 612-13.  At other times,
though, the Court has ignored or downplayed the Lemon factors.  See,
e.g., Marsh v. Chambers, 463 U.S. 783 (1983) (not applying Lemon); Hunt v.
McNair, 413 U.S. 734, 741 (1973) (describing the Lemon factors as
“no more than helpful signposts”).

The
Fifth Circuit has suggested the use of a “reasonable observer test.”  See
Staley v. Harris County, Tex., 461 F.3d 504, 510 (5th Cir. 2006).  This
requires the hypothetical construct of an objective observer who knows all of
the pertinent facts and circumstances.  Capitol Square Review & Advisory
Bd. v. Pinette, 515 U.S. 753, 780 (1995) (O’Connor, J., concurring in part
and concurring in judgment).  This includes any legislative history,
implementation procedure, and other historical context.  Staley, 461
F.3d at 509-10.  The dispositive question is whether this reasonable observer
would fairly understand the governmental action to send a message to
nonadherents that they are outsiders and not full members of the political
community.  Lynch v. Donnelly, 465 U.S. 668, 688 (1984) (O’Connor, J.,
concurring).  Some Supreme Court Justices have, however, criticized this test
as a recent and unwelcomed addition to Establishment Clause jurisprudence and
have described it as fundamentally flawed and unworkable in practice.  See
County of Allegheny v. Am. Civil Liberties Union, Greater Pittsburgh Chapter,
492 U.S. 573, 668 (1989) (Kennedy, J., concurring in judgment in part and
dissenting in part).

Recognizing
the lack of uniform jurisprudence and cognizant of the criticisms of
individuals such as Justice Kennedy,[4]
we nonetheless believe that this case is best addressed with the reasonable
observer test because it does not concern the traditional dispute involving the
placement of a religious object on public property but, rather, the confluence
of multiple governmental actions.  There is no dispute that the State may
build, and allow inmates to use, Christian worship facilities.  The question is
whether the State can also use them as a courtroom.

The
record does not explain why the chapel – as compared to some other facility –
was designated as the branch courthouse.  Thus, unlike cases such as Salazar,
130 S.Ct. 1803, where a Latin cross was used as a monument to honor soldiers
who fell in World War I and not to evangelize, we cannot conclude that a
reasonable observer would realize that the chapel was selected for reasons
other than promoting a Christian message.[5] 
What we are left with, then, is what conclusion would a reasonable observer
draw from seeing the chapel used as a courtroom?

Clearly,
a reasonable observer would recognize the chapel as a Christian facility.  Witnesses
testified that there were Bibles in the chapel and that it was decorated with a
stained glass window with a cross and a representation of the Ten
Commandments.  Equally clear is the precept that the mere presence of Christian
symbols is insufficient to establish a constitutional violation.  In Van
Orden, 545 U.S. at 688-89, the Court noted that Moses stands holding two
tablets with portions of the Ten Commandments written in Hebrew in the Court’s
south frieze; that statues of Moses and the Apostle Paul overlook the rotunda
of the Library of Congress’s Jefferson Building; and that artwork related to
the Ten Commandments adorns the Jefferson Building’s Great Reading Room, the
Department of Justice, the Ronald Reagan Building, and a federal courthouse in
Washington D.C.[6] 
In fact, the Court has held that a relentless and all-pervasive attempt to
exclude religion from every aspect of public life could itself be inconsistent
with the Constitution.  Lee v. Weisman, 505 U.S. 577, 598 (1992).

While
not all religious displays are impermissible, the Supreme Court has found that
some did violate the Establishment Clause.  For example, in McCreary County,
Kentucky v. American Civil Liberties Union of Kentucky, 545 U.S. 844
(2005), the Court held that posting the Ten Commandments in two county
courthouses was unconstitutional.  The Court’s analysis indicates that what
separated these displays from those previously found permissible was
governmental action emphasizing the Ten Commandments’ religious message.  Id.
at 868; see also County of Allegheny, 492 U.S. at 602 (holding a crèche
depicting the Christian Nativity scene placed on the Grand Staircase of the county
courthouse was impermissible).  But cf. Van Orden, 545 U.S. at 701
(upholding the display of the Ten Commandments on the grounds of the Texas
Capitol because State intended the display as a message reflecting Texans’
historical ideals).

The
Fifth Circuit has distinguished between permissible and impermissible religious
displays by considering the larger context.  For example, in Staley, 461
F.3d 504, the court was faced with a memorial to a Houston businessman and
philanthropist.  The monument included a glass-topped display case with an open
Bible.  Id. at 506.  It was vandalized from time to time and, for a
period of several years, contained no Bible.  Id.  In 1995, the monument
was refurbished, the Bible was replaced, and neon lighting was added to the
display case.  Id. at 507.  A number of ministers led prayers at the
monument’s rededication ceremony.  Id.  The Fifth Circuit found that the
monument’s original, primary purpose was to honor the contributions of a
well-respected citizen whose life reflected Christian values.  Id. at 513. 
The references to religion, therefore, did not violate the Establishment Clause
because an objective, reasonable observer would not see the monument’s purpose
as predominantly religious.  However, the refurbishment of the monument, when
viewed in the context of the surrounding facts, reshaped its predominant
message to a religious one.  Id. at 514-15.  Because the monument had
become primarily a religious statement, the Fifth Circuit found that it
violated the Establishment Clause.  Id. at 515.

If
the displays in McCreary, County of Allegheny, and Staley
signaled a predominantly religious message to a reasonable observer, using a
Christian chapel for a courtroom surely does as well.  This is not to say that
the State cannot use a single prison facility for multiple purposes, including
religious services and judicial functions.  The problem in this instance is
that the chapel is unambiguously a Christian worship facility.  If it is
appropriate to use a Christian chapel as a courtroom, it must also be
permissible to use a synagogue, mosque, or temple for the same purpose.  A
reasonable observer watching a trial in any of these facilities would perceive
that a message supporting that particular religion was being sent to those in
attendance.  We conclude, therefore, that the State violated the Establishment
Clause by conducting Lilly’s court proceedings in the chapel.

Courts
must also be cognizant of any reverse messages an Establishment Clause
violation finding sends.  For example, in Salazar, the trial court
ordered the removal of the Latin cross.  The Supreme Court was concerned that
this would send a message hostile to religion particularly because the land in
question had been transferred to the VFW, who could simply reerect the same or
a similar monument.  130 S.Ct. at 1823.  In this instance, moving court
proceedings to some other facility within the prison will send no such message
because the chapel can still be used as a place of worship.

This
does not end our analysis.  The next question is whether Lilly must show harm
and, if so, whether he has.  Lilly argues that a violation of the Establishment
Clause is structural error and, therefore, exempt from harm analysis.  The
Supreme Court has identified the following as structural errors:  the total
deprivation of the right to counsel, the lack of an impartial trial judge, the
unlawful exclusion of grand jurors of the defendant’s race, the denial of the
right to self-representation at trial, the denial of the right to a public
trial, and the submission of an erroneous reasonable-doubt instruction to the
jury.  See Johnson, 520 U.S. at 468-69.  A violation of the
Establishment Clause has not been labeled structural error.  Thus, any error is
subject to harm analysis as constitutional error under Tex. R. App. P. 44.2.  Shelton v. State, 41 S.W.3d
208, 218 (Tex. App.—Austin 2001, pet. ref’d).

A
court of appeals must reverse a judgment of conviction or punishment for
constitutional error unless the court determines beyond a reasonable doubt that
the error did not contribute to the conviction or punishment.  Rule 44.2(a).  Factors
to be considered include the source and nature of the error, the extent to which
the State emphasized it, probable collateral implications, and whether
declaring it harmless would encourage its repetition with impunity.  Harris
v. State, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).  When a defendant has
pleaded guilty to the offense charged, a determination of harm must focus on
whether the error contributed to his decision to plead guilty.  See Rule
44.2(a); Sanchez v. State, 98 S.W.3d 349, 357-58 (Tex. App.—Houston [1st
Dist.] 2003, pet. ref’d).

There
is no indication that holding court in the chapel contributed to Lilly’s
decision to plead guilty.  Lilly was arraigned in the same chapel.  At his
arraignment, Lilly refused a plea bargain offered by the State.  After the court
held a hearing on his motion to transfer proceedings to a public courthouse, Lilly
reached an agreement with the State to plead guilty.  His refusal of the State’s
original plea bargain offer indicates that he was not so susceptible to the
religious setting about which he now complains as to be coerced into pleading
guilty.   Moreover, there is nothing in the record to show that he would have pleaded
not guilty if the court proceeding had been held someplace other than the
chapel.

Thus,
we find beyond a reasonable doubt that the error did not contribute to Lilly’s decision
to plead guilty and that it does not require reversal.  Lilly’s second issue is
overruled.

V.  Conclusion

The judgment of the trial
court is affirmed.

            

 

RICK STRANGE

                                                                                    JUSTICE

 

February 17,
2011

Publish.  See
Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]U.S. Const. amend. I.





[2]We do not hold that the trial court can never exclude
the press or public from a trial because, for example, the court must also
consider the defendant’s right to a fair trial.  See, e.g., Gannett, 443
U.S. 392-93 n.24.  The court also has the authority to consider security
needs.  See Mosby, 703 S.W.2d at 716 (“limitations on pubic attendance
may be imposed so long as they are no more exclusive than necessary to protect
a state interest that outweighs the appellant’s interest in public scrutiny of
the proceedings”).

 





[3]We note, for example, that the new federal courthouse
in El Paso has limited seating in its courtrooms; visitors may not bring cell
phones, computers, cameras, or other electronic devices into the courthouse;
and visitors may not wait in the hallways outside the courtrooms.  David
Crowder, Inside the courthouse Secure, Stunning and no cell phones allowed,
El Paso Inc., http://www.elpasoinc.com/readArticle.aspx?issueid=322&xrec=6080.





[4]To illustrate the lack of consistency in the Supreme
Court’s Establishment Clause jurisprudence, we note that Justice Kennedy
recently cited his criticism of the reasonable observer test but, nonetheless,
still utilized it in Salazar v. Buono, 130 S.Ct. 1803, 1819-20 (2010).

 





[5]In 1934, private citizens placed a Latin cross on a
rock outcropping in a remote section of the Mojave Desert to honor American
soldiers who fell in World War I.  Salazar, 130 S.Ct. at 1811.  The site
of this monument was owned by the federal government but, by the time of this
appeal, had been transferred to the VFW in exchange for other land.  Id.
at 1813.  The Court recognized the religious significance of a cross, but it
also noted the cross had been used as a symbol of honor and respect and found
that its use as a monument to war dead evoked thousands of small crosses in
foreign fields marking the graves of Americans who fell in battle.  Id.
at 1820.

 





[6]Religion has been closely identified with our Nation’s
history and government.  Sch. Dist. of Abington Twp., Pa. v. Schempp,
374 U.S. 203, 212 (1963).  Thus, not only are religious symbols on government
property appropriate in some instances, so too are some religious activities
during governmental functions.  See, e.g., Marsh, 463 U.S. at 792
(Establishment Clause permits a state legislature to open its daily sessions
with a prayer by a chaplain paid by the State).