

# NUMBER 13-12-00250-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**PEDRO CANTU VILLALOBOS,**                                                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                         **Appellee.**

## On appeal from the 398th District Court
## of Hidalgo County, Texas.

# MEMORANDUM OPINION

## Before Chief Justice Valdez and Justices Garza and Perkes
## Memorandum Opinion by Justice Garza

Appellant, Pedro Cantu Villalobos, was convicted of murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). The jury, after finding two enhancement paragraphs true, sentenced him to life imprisonment. On appeal, appellant contends that the evidence was insufficient to support his conviction and that he received ineffective assistance of counsel. We affirm.

# I. BACKGROUND

Officers were dispatched to a residence in Weslaco, Texas, on February 19, 2011, in response to a report of an aggravated assault. When they arrived, they observed a car in front of the residence with a broken driver's side window and damage to the driver's side door. Police later learned that the victim of the assault was Farrah Villalobos, appellant's wife, and that she had already been hospitalized.

Bianca Alvarez, a neighbor, testified that she saw "two guys beating on someone on the ground" that morning. She called 911. As she was talking to police, she realized that appellant was one of the assailants and that the victim was Farrah. Richard Lopez, Alvarez's husband, saw "two guys kicking on someone on the floor." He identified one of the assailants as appellant and the other as appellant's brother Daniel. He could not clearly see who was being beaten, although he saw that it was a female.[1] The thirteen-year-old daughter of Alvarez and Lopez testified that she "saw two guys outside of the car on each side hitting at the doors." She said that when she went outside, "they just kept beating on her, took her out of the car. She was on the ground. He kept—they kept beating on her. One of the smaller guys went to go grab a brick from the other end of the house" and "threw the brick at her." She said she wasn't sure who the assailants were, but she thought that one of them was appellant.

Lopez and Alvarez's ten-year-old son also observed the altercation. He stated that he saw, through his bedroom window, appellant and appellant's brother pull "[a] girl" out of a car and kick and punch her. The men then "dragged her inside" by the legs. He did not know who the victim was.

_____

[1] On cross-examination, Lopez conceded that he had originally told police that he saw Farrah talking to police about a half an hour after Bianca called 911.

2

When investigators came to the residence to execute a search warrant, they observed a vehicle pass by that matched the description of appellant's vehicle. Police stopped the vehicle and arrested appellant. Investigator Vic DeLeon testified that he brought appellant to the sheriff's office and read him his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and that appellant understood and waived those rights. He later obtained a search warrant to acquire samples of appellant's blood, hair, and saliva. While police were in the process of acquiring those samples, appellant expressed his desire to make a statement. Lead investigator Jonathan Palacios took and transcribed appellant's statement.

In the three-page written statement—which contained appellant's signature on the bottom of each page and which was preceded by a written waiver of *Miranda* rights—appellant recounted his version of events. He stated that he drove to McAllen, Texas on the evening of February 18, 2011, to go to nightclubs. Farrah, as well as Daniel and his girlfriend, came along. The group drank beer and liquor on their way to McAllen and, at some point, appellant stopped to purchase cocaine. When they arrived at the first club, Farrah became upset with appellant because "she was at the club to dance not to look at girls dancing on poles." The group left that club and later went to two others. Appellant was drinking and using cocaine throughout the evening. At the end of the evening, Farrah drove the car back to Weslaco. When they returned home, appellant asked Farrah for money so that he could buy more cocaine. Farrah told appellant to wait in his car outside; he did so. A few minutes later, he saw Farrah running out of the house and into a separate car and driving away. Appellant chased Farrah with his car. He caught her and rammed her car from behind "several times."

3

He then told her, "Baby just go back home" and returned to the residence. Appellant continued to drink beer, "one after another." He told Daniel that he "didn't like when Farrah left the house" and that, when Farrah came home, he "was going to beat her ass." After a while, daylight broke and he saw that Farrah had returned home.

According to appellant's statement, he ran toward her car and "threw her wallet which had a bunch of papers and money in it" at the car. He tried to open her car door but she had locked it. So, appellant "decided to grab a brick that was by my house" and he "threw the brick at my wife breaking the driver's side window of her car." He pulled Farrah out of the car by her arms. At one point he fell down due to his intoxication. He ordered Farrah to pick up the papers that had flown out of her wallet when he threw it at the car. When he noticed that "this was not getting Farrah upset," he grabbed a bucket of motor oil and "started pouring it on the house trying to make my wife think that I was going to burn the house down." He pushed Farrah into the bedroom, at which point, appellant stated, "I lost my temper." He slapped Farrah on her face using both hands. She was yelling "leave me alone" and "stop it." She hid next to a bed, which angered appellant, so he pulled her by her hair and threw her onto the bed. Appellant saw Farrah "hit her head against the bed." He resumed hitting her in the head. He also "continued to throw Farrah around the bedroom as I was so angry and still wired up with cocaine and beer." He didn't remember if he kicked Farrah but he noted that he had done so in the past and "my left ankle is swollen so I think I might have kicked her." Appellant stated:

> After doing this several times, I threw Farrah across and over the bed to the other side of the room where she landed on the floor. I then jumped over the bed and noticed that Farrah was knocked out. I noticed that she got stiff and hard almost looking like when some[one] is having a seizure.

4

I then went over to her and . . . I saw that her eyes were going from side to side and that her jaw was closed shut tight (grinding teeth).

Daniel called for an ambulance, which came a few minutes later. Appellant went to the hospital but left when he saw Farrah's family there. Farrah's sister called him and told him to come to the hospital, but appellant replied: "If she dies, she dies. If Farrah dies there is nothing I can do about it."

Erika Perez, Daniel's girlfriend, testified that she came to appellant's residence at around 7:30 in the morning on February 19. She saw Farrrah on the floor "breathing, like, fast, like she couldn't get air." Appellant "was there with her, and he was having— he had her, like, in his arms, and he was crying and telling her that she—that he was sorry and that he loved her a lot."

Farrah arrived at the emergency room in bad condition and was not breathing on her own. She had swelling on her left eye and abrasions on her back and lower extremities. An emergency craniotomy was performed which revealed, according to the neurosurgeon, "a large clot in the brain." Her condition worsened, however, and she was later declared brain dead. Farrah's family decided to take her off life support, and she was pronounced dead on February 25, 2011.

Forensic investigators examined a towel and boxer shorts found at the scene which had apparent blood stains. The blood on the towel was consistent with Farrah's DNA profile and the blood on the boxer shorts was consistent with a mixture from Farrah's and appellant's blood. The physician who performed Farrah's autopsy testified that her cause of death was "complications of blunt force head trauma" and the manner of death was homicide.

The jury was charged on the offenses of murder and manslaughter. It found

5

appellant guilty of murder and, after hearing evidence at the punishment phase, sentenced appellant to life imprisonment. This appeal followed.

## II. EVIDENTIARY SUFFICIENCY

By his first issue on appeal, appellant argues that the evidence adduced at trial was legally insufficient to support the jury's guilty verdict.

### A. Standard of Review and Applicable Law

In reviewing the sufficiency of evidence supporting a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). When faced with conflicting evidence, we presume that the trier of fact resolved any such conflict in favor of the prosecution, and we defer to that resolution. *State v. Turro*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes

6

the particular offense for which the defendant was tried. *Id.* Here, a hypothetically correct jury charge would state that appellant is guilty of the indicted offense if he intentionally or knowingly caused Farrah's death. TEX. PENAL CODE ANN. § 19.02(b)(1). A person acts "intentionally" with respect to the result of his conduct when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a) (West 2011). A person acts "knowingly" with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

The jury was instructed on the law of parties, under which a person is criminally responsible for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2) (West 2011).

## B. Analysis

On appeal, appellant contends that the evidence was insufficient to establish beyond a reasonable doubt that he harbored the requisite intent or knowledge to sustain a murder conviction. He concedes that the evidence established that he grabbed Farrah's arms, pulled her out of her car, slapped her face with his hands, kicked her, threw her across the bed, and caused her to land hard on the floor. However, he claims that this evidence does not establish that he had the "conscious objective or desire" to cause Farrah's death, *see id.* § 7.02(a)(1), or that, "having engaged in such clearly reprehensible conduct, he was 'reasonably certain' that those acts" would cause her death. *See id.* § 7.02(a)(2).

We disagree that a rational juror could not have found the intent element beyond a reasonable doubt. Intent may be inferred from circumstantial evidence such as acts,

7

words, and the conduct of the appellant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Motive is a significant circumstance indicating guilt. *Id.* Here, the evidence showed that appellant became enraged at Farrah when she drove away from their house instead of giving him money to purchase cocaine. According to appellant's written statement, he told his brother that, when Farrah came home, he "was going to beat her ass." The eyewitness testimony established that appellant followed through on his promise by dragging Farrah out of her car, throwing a brick at her,[2] and kicking and punching her in the head repeatedly while she lay on the ground.

Intent may also be inferred from the extent of the victim's injuries. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). In a murder case, a particularly brutal or ferocious mechanism of death, inflicted on a helpless victim, can be controlling upon the issue of intent or knowledge. *Martin v. State*, 246 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (concluding that evidence of severe brain injuries was sufficient to show intent to kill ten-month-old victim). The evidence in this case established that Farrah was savagely beaten while lying prone on the ground after having been dragged from her car. Her injuries were so severe that she was not able to breathe on her own at the time she was admitted to the hospital and was declared brain dead shortly thereafter. From this evidence, a rational juror could have inferred that the assailant was aware that his actions were "reasonably certain" to cause Farrah's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(2); *Patrick*, 906 S.W.2d at 487.

---

[2] Appellant asserts that "[n]o one testified . . . that saw Appellant wield the brick and strike the person on the head with it." However, the thirteen-year-old daughter of neighbors Alvarez and Lopez testified that one of the assailants "went to go grab a brick from the other end of the house" and "threw the brick" at the victim. Moreover, appellant averred in his written statement that he "threw the brick at my wife breaking the driver's side window of her car."

8

Appellant further argues that there was insufficient independent evidence to corroborate his written confession. The State may not rely solely on the defendant's own extrajudicial confession to establish the *corpus delicti* of the offense; instead, some evidence must exist outside of an extrajudicial confession which, considered alone or in connection with the confession, shows that the crime actually occurred. *Salazar v. State*, 86 S.W.3d 640, 644–45 (Tex. Crim. App. 2002). To be sufficient, the corroborating evidence need only permit a rational finding of guilt beyond a reasonable doubt when considered in conjunction with the extrajudicial confession. *Turner v. State*, 877 S.W.2d 513, 515 (Tex. App.—Fort Worth 1994, no pet.). Here, there was ample evidence other than appellant's written confession establishing that the crime actually occurred, including the eyewitness testimony that appellant beat Farrah, as well as the autopsy physician's testimony that Farrah's cause of death was severe blunt-force head trauma and the manner of her death was homicide. This evidence was sufficient to establish the *corpus delicti* of the offense. *See Salazar*, 86 S.W.3d at 644–45.

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence adduced at trial was sufficient to allow a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *See Hacker*, 389 S.W.3d at 865. Appellant's first issue is overruled.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

By his second issue, appellant complains that his trial attorneys were ineffective because they failed to request certain jury instructions at the punishment phase of trial and failed to object to comments made by the prosecutor during closing arguments at the guilt/innocence phase of trial.

9

**A.      Standard of Review and Applicable Law**

To obtain a reversal of a conviction for ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 687). The prejudice prong requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 248 (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (citing *Strickland*, 466 U.S. at 694). "[E]ach case must be judged on its own unique facts." *Davis*, 278 S.W.3d at 353.

The burden is on appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689; *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.—Corpus Christi 2006, no pet.). A reviewing court will not second-guess legitimate tactical decisions made by trial counsel. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008) (noting that, "unless there is a

10

record sufficient to demonstrate that counsel's conduct was not the product of a strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate"). Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions. *Thompson*, 9 S.W.3d at 813; *Jaynes*, 216 S.W.3d at 851.

An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002); *Thompson*, 9 S.W.3d at 814 n.6. In most cases, a silent record which provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001); *Thompson*, 9 S.W.3d at 813–14.

## B. Voluntary Intoxication Instruction

Appellant first alleges that his trial attorneys were ineffective because they failed to request a jury instruction on temporary insanity as a result of voluntarily ingesting an intoxicant. Texas Penal Code section 8.04 provides that, while voluntary intoxication does not constitute a defense to the commission of a crime, evidence of temporary insanity caused by intoxication can be introduced to mitigate the punishment for the crime. TEX. PENAL CODE ANN. § 8.04(a), (b) (West 2011). When temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was caused by intoxication, the trial court must charge the jury in accordance with the provisions of section 8.04. *Id.* § 8.04(c); *see Meine v. State*, 356 S.W.3d 605, 611 (Tex. App.— Corpus Christi 2011, pet. ref'd) ("A court must submit a mitigating instruction on

temporary insanity by intoxication only if the evidence tends to show the intoxication caused temporary insanity in the defendant.")

We find that counsel's failure to request a voluntary-intoxication mitigation instruction was not error because the evidence did not support such an instruction. In order to raise the issue of temporary insanity by intoxication, the evidence must tend to show both that appellant was voluntarily intoxicated and that the intoxication (1) caused him not to know his conduct was wrong or (2) caused him to be incapable of conforming his conduct to the requirements of the law he violated. *Cordova v. State*, 733 S.W.2d 175, 190 (Tex. Crim. App. 1987). Although the evidence clearly established that appellant consumed a significant amount of alcohol and cocaine on the evening of February 18, 2011, there was no evidence showing that he did not know his conduct was wrong or that he was incapable of conforming his conduct to the requirements of the law. *See id.* On the contrary, appellant's written statement to police establishes that he was fully aware of his actions.[3] Appellant did not rely upon voluntary intoxication as a defense at the punishment stage, and counsel therefore did not err by failing to request a voluntary-intoxication mitigation instruction. *See* TEX. PENAL CODE ANN. § 8.04(c); *Meine*, 356 S.W.3d at 611.

## C. Sudden Passion Instruction

Appellant next argues that counsel was ineffective by failing to request a jury instruction on sudden passion at the punishment phase. At the punishment stage of a

---

[3] In his statement, appellant could not recall whether he kicked Farrah, though he thought he might have because his ankle was swollen. In any event, "it is well settled that lack of memory is not the same thing as intoxication; thus, evidence showing loss of memory is not sufficient to require an instruction on temporary insanity." *Reyna v. State,* 11 S.W.3d 401, 403 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (citing *Hart v. State*, 537 S.W.2d 21, 23–24 (Tex. Crim. App. 1976)); *see also Howard v. State*, 239 S.W.3d 359, 365 (Tex. App.—San Antonio 2007, pet. ref'd).

12

murder trial, the defendant may raise the issue as to "whether he caused the death under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02(d). "If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." *Id.* "Sudden passion" means "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). "Adequate cause" means "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

Again, we find that counsel's failure to request an instruction on this issue was not error because the evidence did not support such an instruction. *See Arnold v. State*, 742 S.W.2d 10, 13 (Tex. Crim. App. 1987) (noting that a defendant "is entitled to an instruction on every defensive or mitigating issue raised by the evidence"); *see* TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007) (providing that the trial court shall instruct the jury on the "law applicable to the case"). At various times in his written statement, appellant stated that he was angry at Farrah, but his anger appears to have stemmed only from Farrah's refusal to provide him with money to purchase cocaine and her driving away from her home without him. These actions would not produce, in an ordinary person, a degree of rage sufficient to "render the mind incapable of cool reflection." *See* TEX. PENAL CODE ANN. § 19.02(a)(1). Moreover, the evidence established that a significant amount of time passed between the time when appellant returned home from chasing Farrah in his car and the time when Farrah returned home

13

at dawn.  Accordingly, there was no evidence of any "provocation" by Farrah.  *See id.* §

19.02(a)(2).  Because the evidence did not support a sudden-passion jury instruction,

counsel did not err in failing to request one.

## D.      Improper Jury Argument

Finally, appellant argues that his trial attorneys were ineffective by failing to

object to comments made by the prosecutor during closing argument at the

guilt/innocence phase of trial which allegedly referred to appellant's failure to testify.

The prosecutor stated, in relevant part, as follows:

> Ladies and Gentlemen, I told you at the beginning of this case that we
> were here for Farrah because when we're in this courtroom and you have
> a trial and there's witnesses that are being called, objections being made
> by counsel, it pulls away from what?  They're going to try to pull you away
> the best that they can, get your attention somewhere else so you don't
> think about what happened to Farrah.
>
> But this is her trial.  So when you're in trial and you're lost in all the
> evidence, you have to remember Farrah.  What is it that Farrah went
> through the day she was murdered by her husband?
>
> The only two people who know exactly what happened is [sic] the
> defendant and Farrah.  That's why I don't have to prove the case beyond
> all doubt.  There is absolutely no way for us to know exactly what
> happened because the truth of what exactly happened lies within his
> hands, this defendant.  He knows what happened.  He knows that he was
> beating his wife as she probably sat there begging for him to stop.

Appellant's trial counsel did not object to the argument.

Proper jury argument falls into four well-defined categories of discussion:  (1) a

summation of the evidence; (2) reasonable deductions from the evidence admitted for

consideration by the jury; (3) a rejoinder to argument by opposing counsel; and (4) a

plea for law enforcement.  *Cantu v. State*, 842 S.W.2d 667, 690 (Tex. Crim. App. 1992).

The fact that a defendant did not testify does not fall into any of these categories and

14

may not be the subject of comment by the prosecution. *Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007); *Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001). Such comments run afoul of article 38.08 of the Texas Code of Criminal Procedure and violate the privilege against self-incrimination contained in the United States and Texas Constitutions. *See* U.S. CONST. amend. V; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 38.08 (West 2005) ("The failure of any defendant to . . . testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause.").

Argument will constitute a comment upon the defendant's failure to testify only if "the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify." *Cruz*, 225 S.W.3d at 548 (citing *Bustamante*, 48 S.W.3d at 765). "[T]he implication that the State referred to the defendant's failure to testify must be a clear and necessary one." *Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011). "If the language might reasonably be construed as merely an implied or indirect allusion, there is no violation." *Id.*

Assuming, but not deciding, that "the jury would necessarily and naturally take [the prosecutor's remark] as a comment on the defendant's failure to testify," *see Cruz*, 225 S.W.3d at 548, we nevertheless find that appellant did not meet his burden to show that counsel's failure to object to the remark constituted ineffective assistance. The record does not contain any indication as to why counsel declined to object to the prosecutor's remark. Without anything in the record establishing counsel's reasons for not objecting to the remark, we cannot say that counsel performed unreasonably. *See*

*Mallett*, 65 S.W.3d at 63; *Thompson*, 9 S.W.3d at 813–14. We therefore conclude that appellant has failed to overcome the "strong presumption" that trial counsel's decision not to object to the prosecutor's remark can be considered "sound trial strategy."[4] *See Strickland*, 466 U.S. at 689; *Jaynes*, 216 S.W.3d at 851.

Having found no deficiency in trial counsel's representation, we overrule appellant's second issue.

## IV. CONCLUSION

The judgment of the trial court is affirmed.

_____
DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
12th day of September, 2013.

---

[4] We note that counsel's decision not to object could have been part of a sound trial strategy in that an objection, even if it were sustained, may have further drawn the jury's attention to the fact that appellant did not testify.

16